## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOANNE COUSINS**, on behalf of the **ESTATE OF MATTHEW COUSINS** and on behalf of his **DOHSA beneficiaries** 21 Huntingdon Drive Cole Harbour, NS B2V1V9, | : : : : : : | |
| **TANYA COWBROUGH**, on behalf of the **ESTATE OF ABBIGAIL COWBROUGH** and on behalf of her **DOHSA beneficiaries** 3775 Kencrest Avenue, Apt. 5 Halifax, NS B3K3L4, | : : : : : : : | **CIVIL ACTION NO.** **2:23-cv-02629** |
| **KYLE HAGEN**, on behalf of the **ESTATE OF KEVIN HAGEN** and on behalf of his **DOHSA beneficiaries** 1505 Winchester Road Victoria, BC V8N2B6, | : : : : : : | |
| **AMANDA MacDONALD**, on behalf of the **ESTATE OF BRENDEN IAN MacDONALD**, and on behalf of his **DOHSA beneficiaries** 59 Vicky Crescent Eastern Passage, NS B3G1TS, | : : : : : : : | |
| **KATHRYN BOWEN**, on behalf of the **ESTATE OF MAXIME MIRON-MORIN**, and on behalf of his **DOHSA beneficiaries** 428-5501 Cunard Street Halifax, NS B3K0J4, | : : : : : : : | |
| **MICHAEL CUSTANCE**, on behalf of the **ESTATE OF MATTHEW PYKE**, and on behalf of his **DOHSA beneficiaries** 46 Old Greenfield Branch Road Valley, NS B2N2N0 | : : : : : : | |
| **Plaintiffs,** | : | |

|  |  |
|---|---|
| **v.** | **:** |
|  | **:** |
| **SIKORSKY AIRCRAFT CORPORATION** | **:** |
| **d/b/a SIKORSKY, A LOCKHEED** | **:** |
| **MARTIN COMPANY,** c/o Corporation | **:** |
| Service Company, 2595 Interstate Drive, Suite | **:** |
| 103, Harrisburg, PA 17110, | **:** |
|  | **:** |
| **HELICOPTER SUPPORT, INC. d/b/a** | **:** |
| **HELICOPTER SUPPORT, INC., A** | **:** |
| **LOCKHEED MARTIN COMPANY** | **:** |
| c/o Corporation Service Company, 2595 | **:** |
| Interstate Drive, Suite 103, Harrisburg, PA | **:** |
| 17110, | **:** |
|  | **:** |
| **SIKORSKY INTERNATIONAL** | **:** |
| **OPERATIONS, INC. d/b/a SIKORSKY** | **:** |
| **INTERNATIONAL OPERATIONS, A** | **:** |
| **LOCKHEED MARTIN COMPANY** | **:** |
| 6900 Main Street | **:** |
| Stratford, CT 06615 | **:** |
|  | **:** |
| **Defendants** | **:** |
|  | **:** |
|  | **:** |

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PURSUANT TO *FORUM NON CONVENIENS*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES …………………………………………………...…………….. iii

I.      PRELIMINARY STATEMENT ………………………………………………....… 1

II.     FACTUAL BACKGROUND ………………………………………….……… 2

        A.  The Subject Helicopter …………………………...…………………………….. 2

            1.  Specifications and Electronic Flight Control System ………………..……….. 2

            2.  Development and Certification …………………………………...…………… 3

        B.  The Accident …………………………………………………..….. 8

        C.  Post-Accident Investigation and Findings ………………………………………… 10

        D.  Involvement of the Canadian Department of Justice ………………...…………... 12

III.    LEGAL STANDARD ……………………………………………...…………... 14

IV.     ARGUMENT ……………………………………………….……… 15

        A.  Canada is an Adequate Alternative Forum …………………………………… 15

        B.  Plaintiffs' Choice of Forum is Entitled to Limited Deference ………………..…... 18

        C.  The Balance of Private and Public Interest Factors Weighs in Favor of
            Dismissing the Case ………………………………………………… 20

            1.  All of the Relevant Private Interest Factors Weigh in Favor of Dismissing
                the Claims Herein …………………………………………….…………… 21

                a.  Relative Ease of Access to Sources of Proof …………………………… 21

                b.  Availability and Cost of Obtaining Party and Non-Party Witnesses ……. 26

                c.  Possibility of View of the Premises …………………………………… 29

                d.  All Other Practical Problems that Make Trial of a Case Easy,
                    Expeditious, and Inexpensive …………………………………………... 30

i

2. All of the Public Interest Factors Weigh in Favor of Dismissing the Case ……... 31

   a. Administrative Difficulties Flowing from Court Congestion …………… 31

   b. Fairness of Imposing Jury Duty on the Community …………………….. 33

   c. Local Interest in Having Localized Controversies Decided at Home …... 34

   d. Appropriateness of Having the Trial of a Diversity Case in a
      Forum that is at Home with the Relevant Law that Governs the Case ….. 38

V.   CONCLUSION ………………………………………………………………… 43

## TABLE OF AUTHORITIES

### CASES

*Abiaad v. Gen. Motors Corp.*
538 F. Supp. 537 (E.D. Pa. 1982) ……………………………………………………… 23

*Am. Dredging Co. v. Miller*
510 U.S. 443 (1994) …..……………………………………………………………... 14

*Behrens v. Arconic, Inc.*
2022 U.S. App. LEXIS 18816 (3d Cir. July 8, 2022) …………………………………... 14

*Behrens v. Arconic, Inc.*
487 F. Supp. 3d 283 (E.D. Pa. 2020) ……………………….. 14, 16, 17, 18, 19, 21, 22, 23,
26, 27, 28, 29, 30, 32, 33, 34, 36, 37, 38, 39

*Biskos v. Seaways*
No. 90-2316, 1992 U.S. Dist. LEXIS 2260 (E.D. Pa. Feb. 25, 1992) …………. 39, 40, 43

*Blain v. SmithKline Beecham Corp.*
No. 06-1247, 2007 U.S. Dist. LEXIS 103395 (E.D. Pa. Apr. 25, 2007) …..…………… 35

*Blain v. Smithkline Beecham Corp.*
240 F.R.D. 179 (E.D. Pa. 2007) …………………………………………………………… 35

*Borden, Inc. v. Meiji Milk Prods. Co.*
919 F.2d 822 (2d Cir. 1990) ..……………………………………………………… 17

*Chirinos de Alvarez v. Creole Petroleum Corp.*
613 F.2d 1240 (3d Cir. 1980) ………………………………………………… 40, 42, 43

*Clerides v. Boeing Co.*
534 F.3d 623 (7th Cir. 2008) ………………………………………… 23, 26, 29, 35, 37

*Cooper v. Tokyo Elec. Power Co.*
166 F. Supp. 3d 1103 (S.D. Cal. 2015) ..………………………………………………… 36

*Cruz v. Chesapeake Shipping, Inc.*
738 F. Supp. 809 (D. Del. 1990) …..………………………………………………… 39

*Dahl v. United Techs. Corp.*
632 F.2d 1027 (3d Cir. 1980) …………………………………………….. 23, 26, 29, 37

*Da Rocha v. Bell Helicopter Textron, Inc.*
    451 F. Supp. 2d 1318 (S.D. Fla. 2006) …………………………………… 29, 30, 32, 35

*Das Chagas v. Sedco, Inc.*
    557 F. Supp. 442 (E.D. Pa. 1983) ……………………………………………… 41, 42

*De Alvarez v. Creole Petroleum Corp.*
    462 F. Supp. 782 (D. Del. 1978) ……………………………………………....... 42

*De Mateos v. Texaco Panama, Inc.*
    417 F. Supp. 411 (E.D. Pa. 1976) ……………………………………………….. 41

*Dowling v. Richardson-Merrell, Inc.*
    727 F.2d 608 (6th Cir. 1984) ………………………………………………………… 36

*Esfeld v. Costa Crociere, S.P.A.*
    289 F.3d 1300 (11th Cir. 2002) …..……………………………………....... 38

*Eurofins Pharma US Holding v. BioAlliance Pharma SA*
    623 F.3d 147 (3d Cir. 2010) ……..…………………………………………… 26, 31

*Fatkhiboyanovich v. Honeywell Int'l Inc.*
    No. 04-4333, 2005 U.S. Dist. LEXIS 23414 (D.N.J. Oct. 5, 2005) ..………………….... 34

*Ford v. Brown*
    319 F.3d 1302 (11th Cir. 2003) …..………………………………………... 38

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*
    717 F.2d 602 (D.C. Cir. 1983) …..……………………………………....... 35

*Gulf Oil Corp. v. Gilbert*
    330 U.S. 501 (1947) …………….....… 14, 15, 16, 21, 26, 28, 29, 30, 31, 32, 33, 36, 38, 39

*Harrison v. Wyeth Laboratories*
    676 F.2d 685 (3d Cir. 1982) ……..……………………………………....... 37

*Harrison v. Wyeth Laboratories Div. of Am. Home Prods. Corp.*
    510 F. Supp. 1 (E.D. Pa. 1980) …..……………………………………....... 37

*Hellenic Lines, Ltd. v. Rhoditis*
    398 U.S. 306 (1970) …………....……………………………………… 40, 42

*In re Air Crash over the Taiwan Air Strait on May 25, 2002*
    331 F. Supp. 2d 1176 (C.D. Cal. 2004) ..………………………………... 23, 26, 27, 29, 38

*In re Union Carbide Corp. Gas Plant Disaster at Bhopal*
    634 F. Supp. 842 (S.D.N.Y. 1986) ……………………………………….......... 37

*Ioannides v. Marika Mar. Corp.*
    928 F. Supp. 374 (S.D.N.Y. 1996) ……………………………………………... 39

*Iragorri v. United Techs. Corp.*
    274 F.3d 65 (2d Cir. 2001) ………………………………………………........ 19

*Jennings v. Boeing Co.*
    660 F. Supp. 796 (E.D. Pa. 1987) ..…………………………………………… 24, 34, 37

*Kamel v. Hill-Rom Co.*
    108 F.3d 799 (7th Cir. 1997) ……..…………………………………………....... 35

*Kisano Trade & Invest Ltd. v. Lemster*
    737 F.3d 869 (3d Cir. 2013) ……..…………………………………………….... 19

*Kolawole v. Sellers*
    863 F.3d 1361 (11th Cir. 2017) …………………………………………………… 36

*Koster v. (American) Lumbermens Mut. Casualty Co.*
    330 U.S. 518 (1947) …………..…………………………………………………… 15, 18

*Kultur Int'l Films v. Covent Garden Pioneer, FSP.*
    860 F. Supp. 1055 (D.N.J. 1994) ..…………………………………………… 32

*Lauritzen v. Larsen*
    345 U.S. 571 (1953) …………..…………………………………………………... 40, 41, 42

*Lockman Found. v. Evangelical Alliance Mission*
    930 F.2d 764 (9th Cir. 1991) ……………………………………………………… 18

*Lueck v. Sundstrand Corp.*
    236 F.3d 1137 (9th Cir. 2001) …………………………………………………... 26, 29, 31, 33, 34

*Melgares v. Sikorsky Aircraft Corp.*
    613 F. Supp. 2d 231 (D. Conn. 2009) ………………………………… 27, 29, 30, 40, 41, 42

*Miller v. Boston Sci. Corp.*
        380 F. Supp. 2d 443 (D.N.J. 2005) …………………………………………….. 19, 20, 22, 24

*Neely v. Club Med. Mgmt. Servs.*
        63 F.3d 166 (3d Cir. 1995) ……………………………………………….. 39, 40, 41, 42

*Pain v. United Techs. Corp.*
        637 F.2d 775 (D.C. Cir. 1980) ………………………………………………………... 24

*Papageorgiou v. Lloyds of London*
        436 F. Supp. 701 (E.D. Pa. 1977) ……………………………………………… 40, 42

*Penwest Dev. Corp. v. Dow Chemical Co.*
        667 F. Supp. 436 (E.D. Mich. 1987) …………..………………………………….. 16

*Piper Aircraft Co. v. Reyno*
        454 U.S. 235 (1981) ……………………………………………….. 15, 16, 18, 19, 33, 34, 38

*Pollux Holding, Ltd. v. Chase Manhattan Bank*
        329 F.3d 64 (2d Cir. 2003) ………………………………………………………… 19

*Romero v. Int'l Terminal Operating Co.*
        358 U.S. 354 (1959) …..…………………………………………………………… 40

*Satz v. McDonnell Douglas Corp.*
        244 F.3d 1279 (11th Cir. 2001) ……………………………………………… 16, 17, 26

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*
        549 U.S. 422 (2007) ……………………………………………………………… 14, 43

*Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*
        421 F. Supp. 2d 741 (S.D.N.Y. 2006) ……………………………………………... 24

*Torreblanca de Aguilar v. Boeing Co.*
        806 F. Supp. 139 (E.D. Tex. 1992) ……………………………………… 20, 22, 28, 33, 37

*Van Cauwenberghe v. Biard*
        486 U.S. 517 (1988) …………………………………………………………… 15, 21

*Van Schijndel v. Boeing Co.*
        434 F. Supp. 2d 766 (C.D. Cal. 2006) …………………………... 22, 23, 29, 30, 31, 32, 33

*Wagner v. Olympus Am., Inc.*
    No. 15-6246, 2016 U.S. Dist. LEXIS 68450 (E.D. Pa. May 24, 2016) ..................... 35

*Windt v. Qwest Communs. Int'l, Inc.*
    529 F.3d 183 (3d Cir. 2008) ...............................… 14, 15, 18, 19, 20, 21, 30, 31, 43

*Wong v. PartyGaming, Ltd.*
    589 F.3d 821 (6th Cir. 2009) ……………………………………………..… 18

*Zermeno v. McDonnell Douglas Corp.*
    246 F. Supp. 2d 646 (S.D. Tex. 2003) ……..…………………………………………… 29

## **STATUTES**

28 U.S.C. § 1404(a) …………………………………………………………………... 14

Death on the High Seas Act, 46 U.S.C. § 30301, *et seq.* ……..………………………………… 39

s. 38, *Canada Evidence Act*, RSC 1985, c C-5 ………………………………………… 13, 25

## **OTHER AUTHORITIES**

Fed. R. Civ. P. 45(c)(1)(A) ………………………………………………………… 22

Fed. R. Civ. P. 45(c)(2)(A) ………………………………………………………… 22

I.    **PRELIMINARY STATEMENT**

Defendants Sikorsky Aircraft Corporation, Helicopter Support, Inc., and Sikorsky International Operations, Inc. (collectively "Sikorsky" or "Defendants") file this present Memorandum of Law in support of their Motion to Dismiss pursuant to the doctrine of *forum non conveniens* (the "Motion").

Plaintiffs' attempt to characterize this case as a simple products liability action with a meaningful connection to the Commonwealth of Pennsylvania is inaccurate, misleading, and a misrepresentation of the facts at hand. The accident helicopter, a Sikorsky CH-148, was a military helicopter designed by, for, and in collaboration with, the Canadian Department of National Defence, for its exclusive use and ownership. Given its intended use as the Canadian Air Force's Maritime Helicopter, the Canadian Department of National Defence and its various divisions were closely involved in every aspect of the helicopter's design, testing, and certification. The circumstances of the accident itself—which occurred during NATO military exercises off the coast of Greece—further reveal the foreign connections at hand. Indeed, the present suit's only connection to Pennsylvania is the installation of a "Block 2 Upgrade" onto the helicopter, which was designed and manufactured outside of Pennsylvania, and the flight testing of the accident aircraft prior to its return to Canada, both of which occurred at a now-closed facility in Coatesville. Such limited connection pales in comparison to the deep ties this case holds not only to Canada, but to the Canadian government itself, revealing that venue is significantly more appropriate there. This is especially so since the Canadian military continues to be the sole operator of the CH-148 helicopter.

Therefore, Sikorsky's Motion should be granted pursuant to the doctrine of *forum non conveniens*. First, there can be no question that Canada presents an adequate alternative forum to

entertain this suit.  Second, Plaintiffs—who are all Canadian citizens and represent decedents who were Canadian military servicemembers—are entitled to limited, if any, deference in their choice of forum.  Finally, a balancing of the various interests at play reveals that the relevant Canadian interests far outweigh Plaintiffs' interests and reasons for litigating this case in the United States, including specifically Pennsylvania.  Sikorsky respectfully requests that this Court grant its Motion to Dismiss for *forum non conveniens*.

## II.    FACTUAL BACKGROUND

### A. The Subject Helicopter

#### 1. Specifications and Electronic Flight Control System

The Subject Helicopter, a CH-148 Cyclone (Call Sign "Stalker 22"), is a twin-engine, Fly-by-Wire[1] (FBW) multi-role shipborne helicopter. *See* Canadian Armed Forces CH148822 Flight Safety Investigation Report, File No. 1010-CH148-185716 (DFS 2-4), dated May 11, 2021, a true and correct copy of which is attached to the Pagano Declaration ("Pagano Decl.") as Exhibit ("Ex.") A, at 21 of 79.  The CH-148 is manufactured exclusively for the Canadian military to its specifications and configured with an Electronic Flight Control System (EFCS),[2] coupled to a Flight Director (FD). *See* Declaration of Roger D. Lange, dated September 8, 2023, a true and correct copy of which is attached to the Pagano Decl. as Exhibit B ("Sept. 8 Lange Decl."), at ¶¶ 4, 6.  Normally, a pilot would choose a desired heading, airspeed and altitude using the Flight Director and the Flight Director would then compute and advise the pilot to make the appropriate

---

[1] In a "Fly-by-Wire" helicopter, the pilot makes flight control inputs which are then given effect by the aircraft's flight controls systems, which use computers to send appropriate electrical signals to the relevant helicopter components. *See* Sept. 8 Lange Decl. at ¶ 5 (Pagano Decl., Ex. B).  This is in contrast to a traditional helicopter, where the flight control surfaces and thereby the helicopter's intended components are controlled by mechanical linkages running from the controls within the cockpit. *See id.*

[2] The purpose of the EFCS is to move the flight control surfaces to maintain a desired condition (altitude/airspeed/heading) as set by the pilot, without additional control input from the pilot. *See generally* Pagano Decl., Ex A at 43 of 79.  It is akin to an autopilot.

inputs to remain in the selected condition. *See id.* at ¶ 6.  In the CH-148, there is a pilot-selected option to link the Flight Director to the Electronic Flight Control System so that a pilot can set the desired airspeed, altitude, and heading parameters and the Electronic Flight Control System (in essence, an autopilot) will automatically make the control inputs suggested by the Flight Director to establish the required parameters. *See id.*  The Flight Director does not actually cause the controls to move, it advises the EFCS what to do and the EFCS moves the flight control components.[3] *See id.*  In doing so, the Electronic Flight Control System effectively reduces pilot workloads and enhances operational stability. *See* Pagano Decl., Ex. A at 37 of 79.

The CH-148 is operated exclusively by the Canadian Air Force. *See id.* at 21 of 79.  It has been operational since 2018. *See id.*  It has been approved for, and utilized in, a variety of missions, including anti-submarine warfare, surface surveillance, search and rescue missions, and utility operations. *See id.* at 21-22 of 79.  The CH-148 operates primarily in a low-level environment over water and is designed for all weather operations in civilian and military airspace. *See id.* at 22 of 79.

### 2.  Development and Certification

The Subject Helicopter and its Electronic Flight Control System was developed exclusively for, in direct collaboration with, and pursuant to, specifications set forth and certified by, the Canadian Department of National Defence (DND) and its coordinate branches and divisions. *See id.* at 63 of 79 ("The EFCS and FD software functionalities were designed and certified against the SOI [Statement of Operating Intent], the MHSS [Maritime Helicopter System Specification] and operational considerations established collaboratively by the designers, certification authorities and embedded DND test operators.").  The development and certification process for

---

[3] When the Flight Director and Electronic Flight Control system are both activated, that is considered "coupled flight." Sept. 8 Lange Decl. at ¶ 6 (Pagano Decl., Ex. B).

the CH-148 began in 1990 when the DND was seeking a replacement for the Sikorsky CH-124 Sea King helicopter fleet. *See id.* at 37 of 79.   At that time, the DND set forth a Statement of Operational Requirement (SOR) as part of its Maritime Helicopter Project (MHP), which received the requisite departmental approval. *See id.*   The Maritime Helicopter Project Office created a Maritime Helicopter Requirements Specification (MHRS) document, describing the types of equipment and helicopter capabilities that the Air Force required in its new maritime helicopter. *See id.*  The Maritime Helicopter Project Office also created a Statement of Operating Intent (SOI) explaining how the Canadian Air Force intended to operate the helicopter. *See id.*  Sikorsky had no role in creating the SOI. *See generally id.*  After soliciting Requests for Proposals based on the specifications and requirements set forth, the Canadian Air Force awarded Sikorsky a contract in November 2004. *See id.*   In its proposal, Sikorsky suggested, and the Crown agreed, that the helicopter contain a full authority Fly-by-Wire Electronic Flight Control System. *See id.*

After being awarded the contract to provide the CH-148 helicopters, to ensure contractual compliance, Sikorsky prepared a Maritime Helicopter System Specification (MHSS) document to document the helicopter's operating system specifications, including the Fly-by-Wire and Electronic Flight Control System capabilities. *See id.*   The certification of the helicopter was initially going to be based upon the United States Federal Aviation Administration's (FAA) certification plan for the S-92F (a proposed civilian Fly-by-Wire version of the S-92A). *See id.* at 38 of 79.  However, when the S-92F project was set aside due to limited customer interest, the FAA suspended its certification process for the Fly-by-Wire system. *See id.*   The Canadian Directorate of Technical Airworthiness and Engineering Support (DTAES)—a division of the Canadian Armed Forces' Technical Airworthiness Authority (TAA)—subsequently signed a contract with the FAA and ultimately took on the role of certifying authority for the CH-148,

including the Electronic Flight Control System and the Fly-by-Wire controls. *See id.* Thus, the Canadian Technical Airworthiness Authority and Directorate of Technical Airworthiness and Engineering Support together played a direct and integral role in the CH-148 certification process, and maintained final approval authority over the design of the aircraft and its systems. *See generally id.* The Canadian Directorate of Technical Airworthiness and Engineering Support provided 100 percent of the certification for the CH-148 Electronic Flight Control System. *See id.*; *see also id.* at 60 of 79 ("The certification of one of the world's first full-authority FBW EFCS military tactical helicopter rested solely on [Canadian] DTAES specialists . . . .").

Although the CH-148 Electronic Flight Control System Certification Basis was based on various Federal Aviation Regulations (FAR), these sections in FAR 29 predated the development of Fly-by-Wire technology and did not adequately provide certification guidance to the Canadian Directorate of Technical Airworthiness and Engineering Support for this system. *See id.* at 38-39 of 79. Therefore, the Directorate of Technical Airworthiness and Engineering Support itself developed special conditions to be added to the CH-148 certification process, in combination with other Canadian governmental entities, specifically the National Research Council (NRC) and Transport Canada Civil Aviation (TCCA) flight test resources. *See id.* at 39 of 79. Ultimately, eight (8) special conditions were developed and added to the CH-148 certification basis to define the requirements for a fully Fly-by-Wire military helicopter.[4] *See id.* at 39-40 of 79. In order to certify the CH-148 Helicopter as airworthy, the Canadian Directorate of Technical Airworthiness and Engineering Support tested the Fly-by-Wire Electronic Flight Control System to validate compliance with these conditions. *See generally id.* at 41 of 79. Indeed, it was specifically tested

---

[4] Of these eight, Special Condition 001/09 (Flight Control Position and Authority Awareness) and Special Condition 003/09 (Mode Awareness and Control Strategies) were at issue in the later post-accident investigation. *See* Pagano Decl., Ex. A at 39 of 79.

and certified for the customer-defined mission and mission subsets, and the Flight Director software itself was implemented and tested for compliance with the Maritime Helicopter System Specification and all of the representative flight missions outlined by the government of Canada in the SOI. *See id.* The Flight Director was also tested to ensure that the pilot could safely engage in the short-term overriding of the Flight Director during coupled flight.[5] *See id.* Prolonged overriding of the engaged Flight Director by a pilot inputting excessive nose up attitude and/or angles of bank was not included in the Canadian requirements or the DTAES certification. *See generally id.* at 41-42 of 79. Accordingly, the Directorate of Technical Airworthiness and Engineering Support did not request and the Flight Director was not intended, designed, or tested for pilots inputting excessive nose up attitude and/or angles of bank with the Flight Director engaged in altitude and airspeed hold. *See generally id.* All testing was conducted in accordance with the CH-148 Electronic Flight Control System Test Plan under the supervision and auspices of the Canadian Directorate of Technical Airworthiness and Engineering Support. *See generally id.* at 41 of 79. Indeed, all the tests collectively deemed necessary to demonstrate compliance (including for operational considerations) by the Combined Test Force—a joint group of test pilots from the Canadian DND and Sikorsky—and the engineers were performed to the satisfaction of Directorate of Technical Airworthiness and Engineering Support. *See id.* Of course, it was incumbent upon the Canadian DND to define the operational conditions in which this military helicopter would be deployed. A civilian company such as Sikorsky could neither dictate nor predict every possible military operation in which the helicopter would be used.

The CH-148 was fully approved and certified by the Canadian DND, Technical Airworthiness Authority, and Directorate of Technical Airworthiness and Engineering Support,

---

[5] Overriding the Flight Director means that the pilot has taken manual control of the aircraft from the EFCS. *See* Sept. 8 Lange Decl. at ¶ 7 (Pagano Decl., Ex. B).

after testing and validation both at the Sikorsky West Palm Beach facility and in Canada and on Canadian naval vessels. *See* Declaration of Roger D. Lange in Support of Defendant Sikorsky Aircraft Corporation's, Helicopter Support, Inc.'s, and Sikorsky International Operation, Inc.'s Motion to Dismiss, dated September 7, 2023, a true and correct copy of which is attached to the Pagano Decl. as Exhibit C ("Sept. 7 Lange Decl."), at ¶ 5.  The fleet was subsequently put into production. *See id.* at ¶ 6.  The Subject Helicopter was initially assembled and flight accepted for its "Block 1" delivery—a set of eight helicopters delivered in the Canadian Military—in Sikorsky's West Palm Beach, FL facility. *See id.* at ¶ 7.  After the Subject Helicopter was put into service, it was returned to the United States for the installation of "Block 2" upgrades to the helicopter's software and updates to the helicopter's structural systems. *See id.* at ¶ 8.  The Block 2 Upgrade was installed, and initial acceptance testing was conducted, in Coatesville, PA before the helicopter was transferred to Shearwater, Canada for final government flight approval. *See id.* at ¶¶ 9-10.  No design work of any kind for the CH-148 aircraft systems nor software was conducted in Coatesville, PA.[6] *See id.* at ¶ 11.  Indeed, the only work performed in Coatesville related to the Subject Helicopter was the installation of the Block 2 upgrade and the minor relocation of a tethered sonar subsystem reeling machine in the back of the aircraft, and the related flight testing, with the second—and final—testing and approval conducted in Canada. *See id.* at ¶¶ 11-12.  Plaintiffs' decedent, Brenden MacDonald, took part in this initial flight testing in Coatesville as the Canadian military's counterpart to Sikorsky's flight test pilot. *See id.* at ¶ 12.

---

[6] The Coatesville, PA facility has been closed since March 2022. *See* Sept. 7 Lange Decl. at ¶ 13 (Pagano Decl., Ex. C).  The facility has now been sold to another company. *See id.*  Plaintiffs' suggestion that Sikorsky closed its Coatesville, PA facility due to this accident and after receiving notice that Plaintiffs had retained Pennsylvania counsel is simply untrue. *See* Complaint at 4 n.2.  Sikorsky had been planning to close the facility since at least 2019, but at the request of President Trump, kept the facility open. *See* Sept. 7 Lange Decl. at ¶ 14 (Pagano Decl., Ex. C).  Nonetheless, the closure plans were in place for a significant time, and when the commercial helicopter market did not recover as hoped, Sikorsky finalized the decision to close the facility in 2022. *See id.*

**B.  The Accident**

On April 29, 2020, the Subject Helicopter, a Royal Canadian Air Force CH-148 Cyclone (Registration No. CH148811, Call Sign Stalker 22), crashed in the Ionian Sea approximately seventy-seven (77) nautical miles west of Greece. *See* Pagano Decl., Ex. A at 3, 8, 26 of 79.  The Subject Helicopter had been attached to Her Majesty's[7] Canadian Ship Fredericton, which had been deployed for Operation Reassurance as part of the NATO assurance and deterrence measures. *See id.* at 8 of 79.  The overall mission's primary focus was reinforcing NATO's collective defense. *See id.*

On the day of the accident, the Canadian Air Force crew had been tasked to conduct a surface surveillance mission in the Ionian Sea before performing flight deck training operations to ensure aircrew proficiency. *See id.* at 8-9 of 79.  The day's flight schedule involved three such missions, shared between two of the helicopter air detachment crews—Crew One and Crew Two. *See id.* at 8 of 79.  Each of the crews also brought members of the ship's company on these missions as passengers for demonstration. *See id.* at 9 of 79.

The first mission, conducted by Crew One, was uneventful. *See id.*  At that time, Crew Two—the decedents herein—took control of the helicopter and embarked on the second mission of the day. *See id.*  During the second mission, after completing the required tasks, the crew elected to demonstrate a right-hand Return-to-Target (RTT) maneuver for the passengers on-board. *See id.* at 9-10 of 79. The RTT maneuver is an "in-flight aircraft course reversal that commences with a climb followed by a gradual banking turn, often with pedal input,[8] to reverse the course 180°. At the apex of the climb, the aircraft begins its nose down accelerating attitude back towards the

---

[7] As Queen Elizabeth has since passed, the ship is now titled His Majesty's Canadian Ship Fredericton.

[8] The pedals of a helicopter control the tail rotor, and thus the tail of the helicopter.  For instance, when a pilot depresses the right pedal, the tail moves to the left causing the nose of the helicopter to move to the right.

reference recovery altitude." *Id.* at 9 n.1 of 79. Although the pilot began the maneuver with the Flight Director engaged using the altitude and airspeed hold functions, once the helicopter reached the peak of the maneuver and prior to reversing to return to the starting point, the pilot decoupled the Flight Director, thus manually disengaging the previously selected modes for the helicopter's descent, before reengaging them once the helicopter had completed the maneuver. *See id.* at 9-12 of 79. Importantly, the crew did not brief the maneuver nor the desired Flight Director status during the maneuver, as is required. *See id.* at 9 of 79. Nonetheless, the second mission was completed without issue. *See generally id.* at 12-13 of 79.

At the completion of the third mission, the crew requested permission of a commanding officer to conduct a "Brownie Run"[9] prior to returning to the ship, which was granted. *See id.* at 13-14 of 79. During this Brownie Run, the crew chose to perform a second RTT maneuver—this time to the left. *See id.* at 14 of 79. Prior to engaging in this second RTT maneuver, the crew once again did not brief the action nor discuss the desired level of Flight Director automation selected. *See id.* The crew had been flying at a lower altitude and higher airspeed than authorized in the then-current Maneuvers Manual for the selected configuration immediately prior to the second RTT. *See generally id.* Upon beginning to perform the maneuver, the altitude and airspeed hold functions of the Flight Director were active, just as during the first RTT. *See id.* However, during this second RTT maneuver, the pilot did not deselect (i.e., turn off) these functions prior to the helicopter's pitch reversal, as had been done during the first RTT. *See id.* at 17 of 79. The functions were not designed to, and in accordance with the approved design did not, disengage automatically. *See generally id.* At this time, in order to attempt to maintain the selected low altitude and airspeed, the helicopter began a nose-low accelerating descent, before impacting the water. *See id.* at 17-18

---

[9] A Brownie Run is a "Photo Run" during which the helicopter is maneuvered for the benefit of observers. Pagano Decl., Ex. A at 14 n.3.

of 79.  Given the low altitude of the helicopter, the crew was unable to overcome the helicopter's response that had been induced as a result of leaving the Flight Director engaged and the crew's attempts to gain control of the aircraft failed. *See generally id.* at 18-19 of 79.  All six occupants were fatally injured. *See generally id.* at 13 of 79.

### C.  Post-Accident Investigation and Findings

After the accident, an investigation was conducted by the Canadian authorities.  In May 2020, the Airworthiness Investigative Authority (AIA) replicated and investigated the final flight profile of the accident helicopter. *See id.* at 28 of 79.  This testing was performed with the Flight Director in basic mode (altitude and airspeed hold functions operative and coupled) and with the Flight Director disengaged. *See id.*  The testing revealed that, with the Flight Director engaged as it was during the accident flight, increased manual input to the yaw pedal while performing maneuvers such as an RTT, led to insufficient pitch authority of the cyclic controller to recover the aircraft from a nose-low attitude. *See id.*  The testing also revealed that a pilot would regain pitch control by deactivating the Flight Director. *See id.* at 29 of 79.

Sikorsky conducted control law testing of the CH-148 FCS architecture, which largely confirmed the Airworthiness Investigative Authority's simulator testing. *See id.*  This occurrence was labeled the "Command Model Attitude Bias" (CMAB)—an Electronic Flight Control System behavior pattern that occurs when the Flight Director is overridden by the pilot while the helicopter is in multiple axes at nose high attitudes. *Id.* at 31 of 79.  Command Model Attitude Bias can develop due to prolonged pedal input at high pitch and roll attitudes while the Flight Director's airspeed mode is engaged. *See id.*  Some Command Model Attitude Biases are expected, such as might occur during short duration deviations from the flight path. *See id.* at 31-32 of 79.  In such cases, when the cyclic is returned to a centered (neutral) position, the Command Model Attitude

Bias is removed and the Flight Director commands the EFCS to re-establish the previously selected altitude and airspeed. *See id.* Although unknown to Sikorsky prior to the accident and not revealed during the certification process, small-scale Command Model Attitude Biases are now considered to be normal by the Canadian Project Management Office Maritime Helicopter Project and Sikorsky.[10] *See id.* at 32, 58 of 79. The investigation also revealed that ninety-three (93) similar flight profiles had been performed with the CH-148 fleet, and only the profile flown by the Subject Helicopter resulted in an accident. *See id.* at 33 of 79.

In December 2020, the Canadian Aerospace Engineering Test Establishment (AETE) investigated the Command Model Attitude Bias occurrence throughout the CH-148's full scope of operations. *See id.* The findings of AETE's investigation as to CMAB behavior aligned with those of AIA and Sikorsky. *See id.*

During the course of the investigation, it was determined that although the RTT maneuver was not published in the Standard Maneuver Manual, the SOI, nor the MHSS as part of the expected Air Force flight maneuvers (and thus not included in the Electronic Flight Control System Test Plan), CH-148 pilots still engaged in this maneuver. *See id.* at 54 of 79. In the absence of formal guidance, the pilots shared knowledge and techniques gained from flying other aircraft in addition to the CH-148 for conducting RTTs informally. *See id.* Relatedly, investigations revealed that CH-148 pilots often overrode the FD, as had been done on the accident flight, and improperly employed automation for flight maneuvers that did not require its use. *See id.* at 53 of 79. Indeed, the DND determined that contributing to the accident was ineffective crew resource management, as evidenced by the pilot's failure to verbalize the RTT maneuver or the level of automation

---

[10] The potential for CMABs to develop was unknown to the Combined Test Force, DTAES, and Sikorsky prior to the accident, because small-scale responses to such short duration overrides of the Flight Director were not noticeable. *See id.* at 67 of 79.

selected. *See id.* at 56, 63 of 79.  Ultimately, the DND concluded that the accident occurred due to several factors, including:  (1) the CMAB phenomenon that resulted in insufficient control authority by the pilot to recover the aircraft; (2) ineffective crew resource management; (3) the pilot's failure to decouple the Flight Director pursuant to Standard Maneuvers Manual procedures after experiencing the lack of controller command authority; (4) that the pilots routinely overrode the Flight Director and did so on the accident flight; (5) that RTTs were performed despite no official standard operating procedures for the maneuver; (6) that the flight crew had become complacent; (7) that CH-148 publications provided ambiguous language on the use of the Flight Director; (8) that the CH-148 publications did not adequately warn against overriding the Flight Director; (8) that certification of the Electronic Flight Control System had not included RTT testing; and (9) that the flight mode may not have been adequately visible to the pilots during their performance of the maneuver.[11] *See id.* at 69-70 of 79.

### D.  Involvement of the Canadian Department of Justice

In March 2021, Plaintiffs and Defendants signed a tolling agreement to toll the applicable statute of limitations, as pre-litigation discussions were being conducted.  Considering the discussions between counsel for both parties and the plan to formally mediate the claims, in October 2021, counsel for Plaintiffs sent a four-page document to Sikorsky's counsel, containing an extensive list of requests for Sikorsky documents relating to the design, development, certification, flight testing, operating manuals, and ongoing technical coordination with the Canadian DND.  Sikorsky recognized that sensitive national security interests for the Canadian Crown were involved, particularly given the CH-148's continued operation.  Pursuant to Section

---

[11] While the probable cause findings in the Report may not be admissible at trial, they are provided herein for completeness.  However, any reference to these findings in no way constitutes an admission of liability or agreement with same.

12

38 of the *Canada Evidence Act*,[12] Sikorsky initiated contact with the Attorney General's Office in Canada to notify them of the potential sensitivity of the documents and seek further guidance prior to turning the documents over to Plaintiffs. *See* Letter from Robert J. Fenn, Canadian Counsel for Sikorsky, Rohmer & Fenn, to Nathalie Benoit, General Counsel, National Security Group, Department of Justice Canada (Dec. 23, 2021), a true and correct copy of which is attached to the Pagano Decl. as Exhibit D; Letter from Robert J. Fenn, Canadian Counsel for Sikorsky, Rohmer & Fenn, to Nathalie Benoit, General Counsel, National Security Group, Department of Justice Canada (Jan. 18, 2022), a true and correct copy of which is attached to the Pagano Decl. as Exhibit E.

Sikorsky was directed to the Department of Justice Canada (DOJ)—Office of DND/Legal Advisor, which requested a list of the responsive documents, that Sikorsky provided to the DOJ soon after. *See* Letter from Robert Borland, Director, Claims and Civil Litigation Section, Office of the Legal Advisor to the DND and the Canadian Forces Justice Canada to Robert J. Fenn, Canadian Counsel for Sikorsky, Rohmer & Fenn (Apr. 7, 2022), a true and correct copy of which is attached to the Pagano Decl. as Exhibit F; Letter from Robert J. Fenn, Canadian Counsel for Sikorsky, Rohmer & Fenn, to Robert Borland, Director, Claims and Civil Litigation Section (Aug. 17, 2022), a true and correct copy of which is attached to the Pagano Decl. as Exhibit G.  As the documents are still being reviewed by the Canadian DND, Sikorsky has not provided any documents to Plaintiffs.  Importantly, the DND had previously requested that Sikorsky notify them of any litigation being filed, as this could alter their approach to review of the documents. *See*

---

[12] Section 38 of the Canada Evidence Act provides that:  "Every participant who, in connection with a proceeding, is required to disclose, or expects to disclose or cause the disclosure of, information that the participant believes is sensitive information or potentially injurious information shall, as soon as possible, notify the Attorney General of Canada in writing of the possibility of disclosure, and of the nature, date and place of the proceeding." s. 38.01(1), *Canada Evidence Act*, RSC 1985, c C-5.

Pagano Decl., Ex. F at 1.  The DND has been notified of a pending lawsuit in Nova Scotia related to this same accident in which Sikorsky is a named defendant.[13] *See* Letter from Robert J. Fenn, Canadian Counsel for Sikorsky, Rohmer & Fenn, to Robert Borland, Director, Claims and Civil Litigation Section (February 21, 2023), a true and correct copy of which is attached to the Pagano Decl. as Exhibit H.  While that action is pending in Nova Scotia, Sikorsky has not yet been served. The DND have since been notified of the present action.

### III.    LEGAL STANDARD

"The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947).  Under this doctrine, "a federal district court may dismiss an action on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy."[14] *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007).  Each case will turn on its facts, therefore the district court has great flexibility in evaluating a *forum non conveniens* motion.[15] *See Windt v. Qwest Communs. Int'l, Inc.*, 529 F.3d

---

[13] The lawsuit was filed by Jonathan Gauvin against Lockheed Martin Corporation ("Lockheed"), Lockheed Martin Canada, Inc., and Sikorsky Aircraft Corporation. *See Gauvin v. Lockheed Martin Corp.*, No. 514572, Notice of Action and Statement of Claim, dated April 29, 2022, a true and correct copy of which is attached to Pagano Decl. as Exhibit I.  Gauvin was on the HMCS Fredericton and serving as the Landing Signal Officer during the accident. *See id.* at 4 of 7.  He alleges emotional damages due to witnessing the event. *See id.* at 6 of 7.  The lawsuit brings claims against Lockheed for alleged negligence in the development of publications and manuals for the CH-148, which resulted in the crew being inadequately trained to safely fly the accident helicopter. *See id.* at 5 of 7.  The lawsuit notes as causal factors the failure to properly design, engineer, test, and inspect the helicopter's software. *See id.*

[14] *Forum non conveniens* serves as the common-law counterpart to venue transfer under 28 U.S.C. § 1404(a), and applies almost exclusively when the alternative forum is abroad. *See Sinochem*, 549 U.S. at 430 (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 449 n.2 (1994)).  Unlike a §1404(a) motion, however, *forum non conveniens* provides for dismissal of the action. *See id.* at 429-30.  Plaintiffs may then re-file in the more appropriate forum.

[15] Given the fact-sensitive nature of *forum non conveniens* analyses, the court can rely on affidavits, declarations, and reports submitted by the parties without converting the motion to a motion for summary judgment. *See Behrens v. Arconic, Inc.*, 487 F. Supp. 3d 283, 304 n.19 (E.D. Pa. 2020), *aff'd in part and rev'd in part on other grounds*, 2022 U.S. App. LEXIS 18816 (3d Cir. July 8, 2022).

183, 188 (3d Cir. 2008) (quoting *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988)); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250 (1981) (noting that the doctrine's flexibility is what "makes it so valuable").

The Third Circuit has set forth a three-step test for considering a motion to dismiss for *forum non conveniens*. *See Windt*, 529 F.3d at 189-90.  First, there must be an adequate alternative forum that can hear the claims. *See id.*  If an adequate alternative forum exists, the court must then determine the amount of deference owed to plaintiffs' choice of forum. *See id.* at 190.  And finally, after determining the amount of deference due to plaintiffs' choice, the court must balance the public and private factors set forth by the U.S. Supreme Court in *Gulf Oil*. *See id.*; *see also Gulf Oil*, 330 U.S. at 508-09.  If the balance of factors indicates that proceeding in plaintiffs' chosen forum would "result in oppression or vexation to the defendant out of all proportion to the plaintiff's convenience" the district court may dismiss the case. *See Windt*, 529 F.3d at 190; *see also Koster v. (Am.) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 524 (1947).

## IV.   <u>ARGUMENT</u>

In the present case, careful review of the three-prong analysis set forth in *Windt* counsels in favor of granting Sikorsky's Motion to Dismiss for *forum non conveniens*:  (1) an adequate alternative forum exists in Canada; (2) Plaintiffs—Canadian citizens with no relevant connection to Pennsylvania or the United States—are entitled to limited deference in their choice of Pennsylvania as the forum; and (3) all of the *Gulf Oil* private and public interest factors weigh in favor of litigating this matter in Plaintiffs' home forum, Canada.

### A.  Canada is an Adequate Alternative Forum

The alternative forum requirement of a *forum non conveniens* analysis generally "will be satisfied when the defendant is 'amenable to process' in the other jurisdiction." *Piper*, 454 U.S. at

254 n.22 (quoting *Gulf Oil*, 330 U.S. at 506-07).  Here, Canada is an adequate alternative forum to entertain this case.[16]  Sikorsky is amenable to process in an appropriate Canadian court and will waive any Statute of Limitations defenses.[17] *See generally id.*

Nonetheless, there may be rare circumstances where the other forum's remedy is clearly unsatisfactory in that it is essentially "no remedy at all." *See id.* at 254.  For example, an alternative forum may be inadequate if Plaintiffs' claims are not cognizable in the foreign forum or there are differences in the legal systems that would make the foreign forum clearly unsatisfactory. *See generally Behrens*, 487 F. Supp. 3d at 310.  Still, "[a]n adequate forum need not be a perfect forum" and differences between the legal systems will not render the alternative forum inadequate. *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001).  Indeed, the "possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry." *Piper*, 454 U.S. at 247.

None of the concerns that would render a foreign forum inadequate are present herein. First, Plaintiffs' claims are cognizable in Canada. *See generally Behrens*, 487 F. Supp. 3d at 312. Specifically, Plaintiffs' claims can be brought in the Nova Scotia courts. *See Affidavit of Hon. Ian Binnie, C.C., K.C. in Support of Defendants', Motion to Dismiss on the Basis of Forum Non Conveniens*, dated September 5, 2023, a true and correct copy of which is attached to the Pagano Decl. as Exhibit J ("Binnie Aff."), at ¶ 19.  There, Plaintiffs will have similar legal recourse as exists in the United States. *See id.* at ¶ 29.  Specifically, Plaintiffs will be able to bring claims for the estates under the *Survival of Actions Act*, and for survivors of the decedents under the *Fatal*

---

[16] "Several courts have found Canada to be an adequate alternative forum, and rightly so." *Penwest Dev. Corp. v. Dow Chemical Co.*, 667 F. Supp. 436, 439 (E.D. Mich. 1987) (listing cases).
[17] To the extent this is applicable, Sikorsky also agrees to any conditions on dismissal that the Court sees fit. *See, e.g.*, *Behrens*, 487 F. Supp. 3d at 310-12 (listing conditions on dismissal).

*Injuries Act*. *See id.* at ¶¶ 30-41. Nova Scotia law permits plaintiffs to bring product liability claims against manufacturers under statute, contract, and tort law.[18] *See id.* at ¶¶ 22-26.

Second, Canadian courts have robust procedural systems, with well-developed discovery standards. *See generally id.* at ¶ 77; *see also* Affidavit of Adam L. Harris, J.D. in Support of Defendants' Motion to Dismiss on the Basis of *Forum Non Conveniens*, dated September 6, 2023, a true and correct copy of which is attached to the Pagano Decl. as Exhibit K ("Harris Aff."), at ¶¶ 9-27 (describing the Nova Scotia Courts' trial procedures generally). To the extent that Canada's rules of procedure vary from those here, these differences are minimal and do not affect this analysis. *See Satz*, 244 F.3d at 1283 ("Some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." (quoting *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 829 (2d Cir. 1990))); *see also Behrens*, 487 F. Supp. 3d at 312 (noting that "the Third Circuit has explicitly rejected the argument that lesser or different discovery makes a foreign forum inadequate"). Nonetheless, Canadian courts, and Nova Scotia courts in particular, provide for comparable discovery. *See* Binnie Aff. at ¶¶ 54-76, 77(e)-(h); Harris Aff. at ¶¶ 12-15 (Pagano Decl., Exs. J and K respectively). For instance, the courts allow discovery of both parties and non-parties. *See* Binnie Aff. at ¶¶ 54-73, 77(e)-(h) (Pagano Decl., Ex. J). Canadian courts also provide for comparable trial procedures, including mechanisms to obtain trial testimony of relevant non-party (and party) witnesses.[19] *See id.* at ¶¶ 27, 74-76, 77(e), 77(h).

---

[18] Canadian law also permits claims for contributory negligence under the *Contributory Negligence Act*, and contribution and indemnity under the *Tortfeasors Act*. *See* Binnie Aff. at ¶¶ 46-51 (Pagano Decl., Ex. J). Nova Scotia civil procedure rules in particular also permit counterclaims, cross-claims, and third party claims. *See id.* at ¶¶ 52-53.

[19] For example, Nova Scotia civil procedure rules permit issuance of a subpoena to require the attendance of non-party witnesses at trial, including individuals who reside outside of Nova Scotia. *See id.* at ¶¶ 74-76.

Finally, in addition to providing for sufficient discovery and trial procedures, Canadian law also sets forth a fair damages scheme. *See generally Behrens*, 487 F. Supp. 3d at 315. Under the *Survival of Actions Act*, the estate of deceased person is entitled to recovery for actual pecuniary loss to the estate. *See* Binnie Aff. at ¶ 31 (Pagano Decl., Ex. J). Under the *Fatal Injuries Act*, certain family members of the deceased person can obtain both pecuniary damages and nonpecuniary damages.[20] *See id.* at ¶¶ 34-36. Therefore, even if Plaintiffs' theories of liability might vary, or their potential damages award might be different, "there is no danger that they will be deprived of any remedy or treated unfairly." *Piper*, 454 U.S. at 255. Thus, Canada is an undisputedly adequate alternative forum for the Canadian Plaintiffs herein.[21]

### B. Plaintiffs' Choice of Forum is Entitled to Limited Deference

Once a court is satisfied that there is an adequate alternative forum, the court must determine the amount of deference to be afforded to plaintiffs' choice of forum. *See Windt*, 529 F.3d at 190. Generally, domestic plaintiffs are entitled to significant deference on their choice of forum. *See Piper*, 454 U.S. at 255 (citing *Koster*, 330 U.S. at 524). This is because when a plaintiff brings claims in the home forum, "it is reasonable to assume that this choice is convenient." *Id.* at

---

[20] Pecuniary damages include out of pocket expenses for the benefit of the deceased, reasonable funeral and burial expenses, loss financial support, and loss of valuable services. *See id.* at ¶¶ 34-36. Available non-pecuniary damages include compensation for loss of care, guidance, and companionship the family member might reasonably have expected to receive from the deceased. *See id.* at ¶ 34.

[21] To the extent Plaintiffs may argue that they will be unable to obtain punitive damages or a jury trial in Canada, these factors do not make Canada an inadequate forum. Indeed, the Supreme Court's *Piper* decision "expressly forecloses reliance on differences in the availability of damages" in the *forum non conveniens* analysis. *See Behrens*, 487 F. Supp. 3d at 315 (citing *Piper*, 454 U.S. at 255); *see also id.* (noting that the lack of punitive damages in England "is relevant but does not allow the conclusion that the UK is an inadequate forum" and since plaintiffs will be able to get a fair remedy in English courts, "the fact that their recovery may be less than it what it could be in this Court does not defeat" dismissal). Similarly, the lack of a jury trial does not make a foreign forum inadequate as this would render almost all non-U.S. forums inadequate where few foreign countries offer jury trials in civil cases. *See Wong v. PartyGaming, Ltd.*, 589 F.3d 821, 829 (6th Cir. 2009) (denying argument that the lack of a jury trial made the foreign forum inadequate); *see also Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir. 1991) (same).

256.  However, when the plaintiffs are foreign, this "assumption is much less reasonable." *Id.* Thus, a foreign plaintiff's choice is entitled to lesser deference than traditionally afforded to domestic plaintiffs. *See id.*  As the Second Circuit has explained, in such cases "it is more likely that forum-shopping for a higher damage award or for some other litigation advantage was the motivation for plaintiff's selection."[22] *Pollux Holding, Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003); *see also Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 875 (3d Cir. 2013) (discussing *Pollux*).

Here, Plaintiffs' choice of forum is entitled to lesser deference because they are foreign— all of the Plaintiffs are Canadian citizens. *See generally Behrens*, 487 F. Supp. 3d at 317.  Indeed, this choice is entitled to limited—if any—deference because Plaintiffs have *no* relevant connections to the United States or Pennsylvania. *See generally Miller v. Boston Sci. Corp.*, 380 F. Supp. 2d 443, 450 (D.N.J. 2005) ("In this case, there is scant evidence demonstrating Plaintiffs' connection to the state of New Jersey, and, for that matter, to the United States.").

Thus, while Plaintiffs can usually overcome this lesser deference by making a *strong* showing of convenience, they cannot do so here. *See generally Windt*, 529 F.3d at 190.  Plaintiffs are foreign nationals of Canada, all of their damages witnesses are located in Canada, and most (if not all) relevant documents concerning the CH-148 are located in Canada given the Canadian government's significant role in the design, approval, and certification of the CH-148 helicopter. In fact, Plaintiffs' only connection to Pennsylvania is that their counsel is located therein, which is not sufficient for retaining jurisdiction. *See Kisano*, 737 F.3d at 876 (explaining that "the convenience of counsel in a matter is not a relevant factor"); *Miller*, 380 F. Supp. 2d at 450 (noting

---

[22] Moreover, even if the U.S. district court was not chosen for forum-shopping reasons, "there is nonetheless little reason to assume that it is convenient for a foreign plaintiff." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001).

that the presence of Plaintiffs' counsel in the state did not "weigh in favor of retaining jurisdiction").

Sikorsky's connections to Pennsylvania are similarly tenuous. *See, e.g.*, *Windt*, 529 F.3d at 191. The Coatesville facility has now been closed for over two years, most potential witnesses currently employed by Sikorsky no longer work in Coatesville, and *all* documents previously located there, including any potentially relevant documents herein, have been transferred to other locations, none of which are located in Pennsylvania.[23] *See* Sept. 7 Lange Decl. at ¶¶ 15-16 (Pagano Decl., Ex. C). To the extent Plaintiffs reference Pennsylvania's proximity to Sikorsky's headquarters or state of incorporation, "this factor alone does not establish that Plaintiffs have met their burden of making a strong showing of convenience." *Miller*, 380 F. Supp. 2d at 450. Thus, the foreign Plaintiffs in this action cannot make a strong showing of convenience, and so their choice of forum is entitled to limited—if any—deference.

### C. The Balance of Private and Public Interest Factors Weighs in Favor of Dismissing the Case

After determining the appropriate deference due to the Plaintiffs, the court must weigh the private and public interest factors set forth by the Supreme Court in *Gulf Oil*. *See Windt*, 529 F.3d at 190.

The private factors to be considered are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling, and the cost of obtaining willing, witnesses; (3) the possibility of view of the premises, if view would be appropriate to the

---

[23] Moreover, the transfer of these documents to nearby states does not make Pennsylvania more convenient. *See Torreblanca de Aguilar v. Boeing Co.*, 806 F. Supp. 139, 144 (E.D. Tex. 1992) ("The fact that some evidence concerning the aircraft's design and manufacture may be located elsewhere in the United States does not make the Eastern District of Texas a convenient forum.").

action; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Gulf Oil*, 330 U.S. at 508.

The public factors to be considered include:  (1) administrative difficulties flowing from court congestion; (2) the fairness of imposing jury duty on a community that has little relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) the appropriateness of having the trial of a diversity case in a forum that is at home with the relevant law that governs the case. *Id.* at 508-09.

Here, "the balance of these factors favors dismissal of the case." *Windt*, 529 F.3d at 192.

### 1.  All of the Relevant Private Interest Factors Weigh in Favor of Dismissing the Claims Herein

#### a.  Relative Ease of Access to Sources of Proof

The first private interest factor, considering the relative ease of access to sources of proof, "heavily favors dismissing this case." *Behrens*, 487 F. Supp. 3d at 319.  As the CH-148 is a military aircraft, and the Canadian military was actively involved in its development, much of the evidence pertaining to its design, testing, and certification is located in Canada.  Similarly, documents relevant to Plaintiffs' claims stemming from warnings or other communications concerning the EFCS, will be located in Canada.  Moreover, most of the documentation pertaining to the use and maintenance of the helicopter is in Canada, as the helicopter fleet has been in operation by the Canadian military since 2018.

While there is also evidence located in the United States, such as Sikorsky's internal company policies concerning design and testing, the fact that evidence is located in both the United States and Canada does not make this factor neutral. *See id.*  Instead, the court should consider where it will be easier for the parties to obtain the evidence relevant to claims *and* defenses. *See id.*; *see also Van Cauwenberghe*, 486 U.S. at 528.  In this case, all U.S.-based evidence that is

relevant to Plaintiffs' claims is in Sikorsky's possession[24] and can be transferred to Canada.[25]  *See Behrens*, 487 F. Supp. 3d at 319 (noting that the U.S.-based evidence "that is relevant to Plaintiffs' claims is largely in control of the parties and can be electronically transferred").

Sikorsky will agree to make evidence and witnesses in its control available in the appropriate court in Canada in accordance with the Canadian rules of discovery and evidence.  On the other hand, most of the Canada-based evidence, which is relevant to Sikorsky's defenses, is in the possession of non-parties and would be obtainable in the United States only "at significant cost"—if at all. *Id.*  Thus, while dismissal "would not impede Plaintiffs' access to sources of proof located in the United States," permitting the case to remain in the United States will impede Sikorsky's access to sources of proof located in Canada. *Miller*, 380 F. Supp. 2d at 453; *see also Van Schijndel v. Boeing Co.*, 434 F. Supp. 2d 766, 778 (C.D. Cal. 2006) (finding this factor weighs strongly in favor of dismissal where "most of the evidence pertaining to liability in this case is in Singapore and the products liability evidence will be transported there at Defendants' own expense").

For instance, witnesses to the accident are in Canada, outside of this court's 100-mile subpoena reach. *See Behrens*, 487 F. Supp. 3d at 321; *see also* Fed. R. Civ. P. 45(c)(1)(A), (c)(2)(A).  Further, much of the evidence concerning the accident itself, including the recovered wreckage, is in Canada, as Canadian agencies investigated the accident—weighing in favor of

---

[24]  Importantly, none of the U.S.-based evidence in Sikorsky's possession is actually located in Pennsylvania, weighing against the purported convenience of the Eastern District of Pennsylvania, at least as to this factor. *See Torreblanca*, 806 F. Supp. at 144; *Van Schijndel*, 434 F. Supp. 2d at 777-78.

[25]  Although some documents may be subject to ITAR, this evidence can be produced subject to the appropriate licensing and approval.  Moreover, much of the U.S.-based evidence is already located in Canada given the extensive collaboration between Sikorsky and the Canadian government on the CH-148's design, development, and use. *See, e.g.*, *Van Schijndel*, 434 F. Supp. 2d at 777 (explaining that "any investigation-related evidence or witnesses in Boeing's possession, custody or control will be available in Singapore"—the alternative forum).  Thus, ITAR is unlikely to present a significant hurdle.

dismissal.[26] *See Behrens*, 487 F. Supp. 3d at 320-21; *see also Abiaad v. Gen. Motors Corp.*, 538 F. Supp. 537, 542 (E.D. Pa. 1982) ("All of the witnesses and evidence concerning the accident itself and the relevant events leading up to, and following it, are in Abu Dhabi.").  For example, the cockpit voice recorders and flight data were analyzed by, remain in the physical possession of, and are owned by, the Canadian DND. *See* Sept. 7 Lange Decl. at ¶¶ 16-17 (Pagano Decl., Ex. C); *see also In re Air Crash over the Taiwan Strait on May 25, 2002*, 331 F. Supp. 2d 1176, 1195 (C.D. Cal. 2004) [hereinafter *Air Crash over the Taiwan Strait*].

Obtaining evidence relevant to Sikorsky's potential defenses will be especially difficult if the case proceeds here because it is located *almost exclusively* in the hands of the Canadian DND, which is a non-party to this action.  Indeed, if Sikorsky asserts a defense of contributory negligence, all evidence concerning the helicopter crew, the Canadian Air Force's training and other policies, and other potential contributions to the accident is located in Canada.[27]  For instance, to the extent Plaintiffs' claims stem from the performance of an RTT maneuver, all information concerning the performance of such maneuvers by Air Force members, including how and why it was authorized, is in Canada.  Relatedly, all evidence pertaining to the maintenance and use of the Subject Helicopter, which was in the DND's exclusive possession since 2018, is located in Canada. *See Dahl v. United Techs. Corp.*, 632 F.2d 1027, 1031 (3d Cir. 1980) (noting that defendant's last contact with the accident helicopter was seven years prior to the crash, during which time it was

[26] To the extent that Sikorsky participated in the investigation and conducted post-accident testing, this "does not imply that Defendants have access to any of the other records of that investigation." *Id.*  Moreover, any documents pertaining to the investigation created by Sikorsky will also be available in Canada. *See generally id.*
[27] The Canadian DND's Accident Report concluded that inadequate crew management contributed to the accident. *See* Pagano Decl., Ex. A at 68.  Thus, the record supports Sikorsky's potential contributory negligence defense. *See, e.g.*, *Clerides v. Boeing Co.*, 534 F.3d 623, 629 (7th Cir. 2008) (finding that there is record support for Boeing's third-party defense where Greece's investigation of the crash faulted both Boeing and the aircraft operator).

in service with other owners); *see also Miller*, 380 F. Supp. 2d at 452 ("Litigating a products liability case where all of the evidence relating to the use of the product is located on another continent poses inherent difficulties.").

Thus, most of the evidence necessary to fully and fairly adjudicate this case is in the hands of a foreign non-party that is not subject to process in this Court. Obtaining evidence from Canadian non-parties would require resort to letters rogatory, which is "cumbersome and costly."[28] *Jennings v. Boeing Co.*, 660 F. Supp. 796, 806 (E.D. Pa. 1987); *see also Pain v. United Techs. Corp.*, 637 F.2d 775, 789 (D.C. Cir. 1980) (explaining that the scope of "foreign privilege might prove broader under the letter rogatory procedure than under either local law or American law"). Moreover, because letters rogatory are discretionary, the Canadian court need not comply if it would be contrary to public policy. *See* Binnie Aff. at ¶ 81 (Pagano Decl., Ex. J). Here, the production of potentially sensitive military documents in a foreign court may well be denied on such basis.

In fact, the production of any evidence in the DND's possession pursuant to letters rogatory would require DND input before a Court Order could be granted. *See id.* at ¶ 84 (noting that Section 38's disclosure procedure would apply in Pennsylvania or Nova Scotia). As noted earlier, the documents in this case may contain sensitive or injurious information that could harm Canadian national security if produced. *See generally id.* at ¶ 85. Due to the potentially sensitive nature of the documents in this case, the DOJ has been notified pursuant to Section 38 of the *Canada Evidence Act*.[29] Given the strong policies underpinning Section 38, which restricts production of

---

[28] Indeed, where, as here, numerous witnesses and documents would require the use of letters rogatory, this factor will weigh heavily in favor of dismissal. *See Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 769 (S.D.N.Y. 2006).

[29] The Canadian DND has agreed that review of these documents is necessary, and is currently in the process of analyzing a set of documents that Plaintiffs had previously requested. *See* Pagano Decl., Ex. F. The

sensitive or injurious information in a *Canadian* proceeding prior to a statutorily-mandated disclosure proceeding, it is likely that the DND will approach the production of potentially sensitive documents in a *foreign* court with heightened care and scrutiny. *See generally id.* at ¶¶ 84-95.   Thus, the DND will review any requested documents prior to producing them in compliance with the Letters Rogatory as required by Section 38's disclosure procedures, which apply regardless of the location of the proceeding, ultimately resulting in delay and potentially preventing production of certain documents.[30] *See id.* at ¶ 84-97.

Further, the *Canada Evidence Act* is already implicated in this case, at least as to certain documents that Plaintiffs had previously requested.   Because the DND is in the process of reviewing these documents, under Section 38.02(1)(a), Sikorsky would not be permitted to produce such evidence in a Canadian proceeding until approval is obtained. *See* s. 38.02(1)(a), *Canada Evidence Act*, RSC 1985, c C-5; *see also* Binnie Aff. at ¶¶ 89-91, 96 (Pagano Decl., Ex. J).   And while Section 38 does not bar production of evidence in Sikorsky's possession in the United States, production of these documents before they have been fully reviewed may strain relations between Sikorsky (as well as the United States) and Canada, as it would indicate an indifference to Canadian national security interests.   The same is true for other documents that Plaintiffs have not yet requested but that would inevitably trigger a Section 38 review in a Canadian proceeding.[31]

---

DND's response to the initial set of documents requested and the desire to be notified of pending litigation suggests that the documents involved herein may be sensitive.

[30] Indeed, the DND might be more willing to permit production of sensitive documents in a local proceeding where it could ensure adequate protections for potentially injurious information, rather than permitting such documents to be produced in a foreign proceeding where it is subject to foreign rules and the DND is restricted from further input or review.

[31] Although this is not an explicit factor to be considered in the *forum non conveniens* analysis, this underscores important Canadian interests in the trial of this case, including the evidence that might be produced.

Ultimately, because proceeding in Canada will allow for the most convenient access to evidence, and avoid these policy concerns, this factor weighs significantly in favor of litigating the case in Canada. *See, e.g.*, *Clerides*, 534 F.3d at 629; *Satz*, 244 F.3d at 1283-84; *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1146-47 (9th Cir. 2001); *Dahl*, 632 F.2d at 1031; *Behrens*, 487 F. Supp. 3d at 321-22; *Air Crash over the Taiwan Strait*, 331 F. Supp. 2d at 1196-97.

b.   Availability and Cost of Obtaining Party and Non-Party Witnesses

The second *Gulf Oil* private interest factor—the availability of compulsory process for attendance of unwilling and willing witnesses and the costs associated therewith—weighs greatly in favor of dismissal. *See Gulf Oil*, 330 U.S. at 508.   Obtaining witness testimony will be significantly easier and less costly in Canada.

Indeed, most of the relevant witnesses that may be called are located in Canada. *See Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 162 (3d Cir. 2010) (affirming district court's dismissal of case on *forum non conveniens* grounds in part because record confirmed that majority of key witnesses were located in the foreign forum).   Plaintiffs, their family members, and damages witnesses are located in Canada. *See Behrens*, 487 F. Supp. 3d at 325 (noting that it would be "far more convenient" for Plaintiffs to attend trial in their home forum to the extent they are required to testify regarding their damages).   Other key witnesses who may be relevant both to Plaintiffs' claims and to Sikorsky's defenses are also located in Canada. For example, relevant witnesses located in Canada include:   current and former active duty members of the Canadian military involved in the leadership and supervision of CH-148 operations; current and former Canadian civilian employees involved in the design, development, approval, acceptance, and certification process for the CH-148; eyewitnesses to the accident; current and former Canadian military personnel involved in the training and competency testing

26

of CH-148 pilots; current and former military personnel involved in the decision to allow the informal Return-to-Target maneuver to be performed without specific training; various Canadian military officers and employees involved in maintaining and operating the aircraft; and Canadian military and civilian personnel involved in the accident investigation.  On the other hand, most, if not all, of the U.S.-based witnesses are Sikorsky employees, who Sikorsky will ensure are available in Canada. *See generally Melgares v. Sikorsky Aircraft Corp.*, 613 F. Supp. 2d 231, 246-47 (D. Conn. 2009) (finding Sikorsky's offer to make all relevant evidence and witnesses available in Spain sufficient where plaintiffs were primarily seeking evidence and witnesses concerning Sikorsky's design and manufacture of the accident helicopter).

Moreover, courts have emphasized the importance of the availability of compulsory process over non-party witnesses. *See Behrens*, 487 F. Supp. 3d at 324.  Here, few, if any, of the U.S. witnesses will be non-parties.[32]  Conversely, most of the relevant witnesses located in Canada are non-parties, where they are not subject to this Court's jurisdiction.

Potential non-party witnesses located in Canada include both civilian and government witnesses.  There is provision in the procedural rules of the Nova Scotia Supreme Court for the court, on the application of a party, to order the examination before trial of a non-party individual, including Military/DND witnesses, believed to be in possession of relevant information of documents. *See* Binnie Aff. at ¶¶ 67-68 (Pagano Decl., Ex. J).   If the case were to proceed in the United States, it may be possible to petition Canadian courts for discovery of civilian witnesses.

---

[32] The only non-party witnesses located in the United States are likely to be former Sikorsky employees who worked on the CH-148 project.  Although it is unclear if any such non-party witnesses will be relevant herein, it is similarly unclear that they would be subject to process in the Eastern District of Pennsylvania, as they may no longer work or reside therein or within 100 miles of this court. *See, e.g.*, *Air Crash over the Taiwan Strait*, 331 F. Supp. 2d at 1199 (noting that former Boeing employees might have been outside the 100-mile radius defining the court's subpoena power).  Thus, to the extent that these witnesses are not subject to process in Canada, it is unclear that they would be subject to process in this Court either.

*See id.* at ¶¶ 79-81.  However, while there are procedures to do so, deposition testimony of civilian non-parties via letters rogatory is not guaranteed. *See generally id.*; *id.* at ¶¶ 72-73. Further, many of the relevant witnesses located in Canada are current Military/DND employees, raising additional concerns, as not only is the deposition testimony not guaranteed (since it is subject to discretionary judicial approval), but it would also be constrained by Section 38 of the *Canada Evidence Act*. *See id.* at ¶ 72.  This factor would favor the action proceeding in Canada, to allow the Canadian judiciary to address how best to handle the disclosure of sensitive information that could impact the national security interests of Canada.

Moreover, letters rogatory are expensive, time-consuming, and may not be an adequate substitute for in-trial testimony. *See Torreblanca*, 806 F. Supp. at 144.  Indeed, while deposition testimony of Canadian witnesses *may* be available in the United States, trial testimony of many key non-parties witnesses would *not* be. *See Behrens*, 487 F. Supp. 3d at 324 (noting that foreign witnesses located outside of the court's 100-mile subpoena power could not be compelled to attend trial in Pennsylvania).  On the other hand, Canadian courts *can* compel trial testimony from non-party witnesses in Canadian proceedings, including Military/DND employees. *See* Binnie Aff. at ¶¶ 74-75 (Pagano Decl., Ex. J).  Therefore, if the case were to proceed in Canada, Sikorsky would at least be able to call these government witnesses (as well as other non-party witnesses) to the stand at trial, whereas in the United States trial testimony would be entirely unavailable, and deposition testimony would be constrained (if permitted at all).  As, the U.S. Supreme Court has explained, "to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants." *Gulf Oil*, 330 U.S. at 511; *see also Behrens*, 487 F. Supp. 3d at 324 (explaining that deposition testimony is not an adequate substitute for live testimony at trial).

Thus, litigating in Canada would ensure that both Plaintiffs and Defendants have adequate access to key witnesses.

Moreover, litigating this case in the United States would result in higher costs in obtaining witness testimony.  Because most of the witnesses located in the United States are Sikorsky employees, Sikorsky is willing to pay for the cost of securing their testimonies in Canada.[33]  In contrast, to require Plaintiffs, their damages witnesses, and any other potential third-party witnesses who could be called upon to testify in this proceeding, to travel to the United States would incur much more expense. *See, e.g.*, *Van Schijndel*, 434 F. Supp. 2d at 779.

Courts have consistently held that where, as here, a significant number of non-party witnesses are present in the foreign forum, requiring use of letters rogatory to obtain testimony that would not be live, and the defendants will (or can be required to) make their witnesses available in the foreign forum for both deposition and live testimony, this factor weighs in favor of dismissal. *See, e.g.*, *Clerides*, 534 F.3d at 629-30; *Lueck*, 236 F.3d at 1146-47; *Dahl*, 632 F.2d at 1031; *Behrens*, 487 F. Supp. 3d at 324-25; *Melgares*, 613 F. Supp. 2d at 246-47; *Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318, 1324 (S.D. Fla. 2006); *Air Crash over the Taiwan Strait*, 331 F. Supp. 2d at 1199-1200; *Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d 646, 661 (S.D. Tex. 2003).  As such, this factor weighs heavily in favor of dismissal.

### c.   Possibility of View of the Premises

This third factor need only be considered to the extent that it is relevant to the proceeding. *See Gulf Oil*, 330 U.S. at 508.  Here, it is unlikely that view of the accident site—the Ionian Sea— will be necessary.  However, some courts have considered the location of the wreckage under this

---

[33] Indeed, even if the case proceeds in this district, Sikorsky will *still* incur costs in bringing its employees to trial as many employees who worked on the CH-148 program are now located at its company headquarters in Connecticut or at its production facility in West Palm Beach, Florida. *See, e.g.*, *Air Crash over the Taiwan Strait*, 331 F. Supp. 2d at 1199-1200.

factor. *See, e.g.*, *Melgares*, 613 F. Supp. 2d at 247; *Da Rocha*, 451 F. Supp. 2d at 1324.  Here, the recovered wreckage of the helicopter, including the cockpit voice recorder ("CVR") and flight data recorder[34] ("FDR") are all located in Canada. *See* Sept. 7 Lange Decl. at ¶¶ 16-17 (Pagano Decl., Ex. C).  Because the CVR and FDR provide critical evidence concerning the crew's final moments, this factor also weighs heavily in favor of dismissal.

> ### d.  All Other Practical Problems That Make Trial of a Case Easy, Expeditious, and Inexpensive

The final private interest factor requires the Court to consider all other practical problems that make trial of a case easy, expeditious, and inexpensive. *See Gulf Oil*, 330 U.S. at 508. "Actions pending in a foreign forum should be taken into account by courts, as the doctrine of *forum non conveniens* was designed in part to avoid these inconveniences." *Van Schijndel*, 434 F. Supp. 2d at 780.  Therefore, courts are permitted to consider related pending litigation as a factor favoring dismissal. *See, e.g.*, *Behrens*, 487 F. Supp. 3d at 331-32; *Windt*, 529 F.3d at 196-97.

In the present case, there is a pending action that has been filed in Nova Scotia against Lockheed Martin Corporation (Sikorsky's parent corporation), Lockheed Martin Canada, Inc., and Sikorsky Aircraft Corporation by Jonathan Gauvin, a member of the Canadian Armed Forces, asserting psychiatric injury on account of witnessing the accident. *See* Pagano Decl., Ex. I at 4-5 of 7.  The claims allege that Lockheed/Sikorsky was negligent in developing publications and manuals for the CH-148, which led to the crew being inadequately trained to safely fly the helicopter. *See id.* at 5 of 7.

---

[34] While the flight recorder data has been provided to Sikorsky in the United States, the actual flight recorder is still in the possession of the Canadian government. *See* Sept. 7 Lange Decl. at ¶ 16 (Pagano Decl., Ex. C).  Further, the technicians who analyzed the data are in Canada, thereby raising issues concerning the availability of testimony to authenticate such evidence. *See supra* III.C.1.b.  Moreover, Sikorsky has no access to the cockpit voice recorder, which remains in the Canadian government's possession, nor its data. *See* Sept. 7 Lange Decl. at ¶ 16 (Pagano Decl., Ex. C).

While the claims brought by Gauvin may be different from those herein, the case arises out of the same facts.  For example, in alleging Lockheed Martin's negligence in developing publications and manuals for the CH-148, Gauvin asserts similar causal factors as Plaintiffs herein. *See id.* (listing as causal factors of the accident that "Lockheed failed to completely test and inspect the software in the electronic flight control laws" and "Lockheed failed to properly design and engineer the aircraft's automation system").  Thus, facts and issues involved in each case are likely to significantly overlap as they share a "common nucleus of operative facts."[35] *Eurofins*, 623 F.3d at 162; *see also Lueck*, 236 F.3d at 1147 (noting that "a significant number of the same witnesses will be needed in both proceedings and much [of] the same evidence will have to be presented to both court").  Therefore, it would subject Sikorsky to oppression and vexation to have to litigate two related cases arising from the same event in different forums, where such cases raise similar issues and will require similar (if not the same) evidence and witnesses. *See Windt*, 529 F.3d at 196-97; *Van Schjindel*, 434 F. Supp. 2d at 780 (holding that two proceedings investigating the crash would be "inefficient" and the foreign court would be proceeding on these issues regardless, thus weighing in favor of dismissal).  Thus, the final private interest factor, like the others, weighs in favor of dismissing this case.

### 2.  All of the Public Interest Factors Weigh in Favor of Dismissing the Case

#### a.  Administrative Difficulties Flowing from Court Congestion

The first public interest factor looks to administrative difficulties in courts "when litigation is piled up in congested centers instead of being handled at its origin." *Gulf Oil*, 330 U.S. at 508. The courts in Nova Scotia—where most Plaintiffs reside—are well-equipped to handle this matter

---

[35] Questions relevant to both cases may include the extent of Sikorsky's knowledge concerning the Command Model Attitude Bias, whether the Electronic Flight Control System was tested sufficiently, and whether the EFCS was designed defectively.

in a timely fashion. *See, e.g.*, *Van Schijndel*, 434 F. Supp. 2d at 782; *Kultur Int'l Films v. Covent Garden Pioneer, FSP.*, 860 F. Supp. 1055, 1068 (D.N.J. 1994).  The typical length of a trial from start to finish in Nova Scotia is one-and-a-half to two years. *See* Harris Aff. at ¶ 27 (Pagano Decl., Ex. K).  Further, because the case will proceed therein as a bench trial, many of the time-consuming procedures involved in jury trials, such as voir dire, will be absent. *See* Binnie Aff. at ¶ 28 (Pagano Decl., Ex. J).

On the other hand, allowing a case as complex as the one herein to proceed here will burden the Court significantly.  As of June 30, 2023, there were a total of 8,155 pending cases in this District. *See* U.S. District Courts – Combined Civil and Criminal Federal Court Management Statistics (June 30, 2023), available at https://www.uscourts.gov/file/73187/download, a true and correct copy of which has been attached to Pagano Decl. as Exhibit L.  The median time for a civil case to proceed from filing to trial was 24.7 months. *See id.*  This is slightly longer than the potential one-and-a-half-year timeframe for a case in Nova Scotia. *See* Harris Aff. at ¶ 27 (Pagano Decl., Ex. K).  Moreover, trying this case in this District would burden the community by expending tax dollars and jurors' time, while also hindering local litigants from trying their own cases in their home forum. *See Van Schijndel*, 434 F. Supp. 2d at 782.  Therefore, this factor weighs in favor of litigating the case "at its origin"—in the Canadian courts.[36] *Gulf Oil*, 330 U.S. at 508; *see also Da Rocha*, 451 F. Supp. 2d at 1325 (agreeing that "from an administrative standpoint, it makes little sense to use the resources and facilities of a busy United States federal court to try these cases").

---

[36] Some courts give this factor no weight where the Court's "administrative and legal obligations do not put it at an advantage or a disadvantage relative to" the foreign court. *Behrens*, 487 F. Supp. at 332.  To the extent the Court finds so herein, this factor should also be accorded no weight.

b. <u>Fairness of Imposing Jury Duty on the Community</u>

The second public interest factor weighs in favor of dismissing the claims. As the Supreme Court has explained, "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gulf Oil*, 330 U.S. at 508-09.

Pennsylvania does have a slight interest in the case by virtue of Sikorsky being registered to do business therein, as well as the prior work completed on the CH-148 helicopters. *See generally Behrens*, 487 F. Supp. 3d at 339. This interest is tempered, however, by Sikorsky's closure of the Coatesville facility, as it no longer conducts any business in the state. Moreover, despite any minimal interest that Pennsylvania may have in this case, the dispute in this case is local to Canada, not Pennsylvania or the United States. *See id.*; *see also Van Schijndel*, 434 F. Supp. 2d at 783 (emphasizing that "even if a forum does have a connection to the litigation, this fact does not mean that a motion to dismiss on *forum non conveniens* grounds should be denied" (citing *Lueck*, 236 F.3d at 1147)).

It is unlikely that Pennsylvania residents have an interest in this case—involving Canadian military decedents fatally injured on a Canadian military helicopter during NATO training exercises conducted off the coast of Greece—great enough to justify imposing the time and cost of this trial on the jurisdiction. *See Piper*, 454 U.S. at 261 ("The American interest in this accident is simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here."). In fact, as discussed below, Canada has a "paramount interest" in this lawsuit. *Torreblanca*, 806 F. Supp. at 144. Given the incredible foreign interest in this case, Pennsylvania jurors should not bear the burden of a protracted litigation "bearing little relation to the interests or concerns of their community." *Id.*; *see also Lueck*, 236 F.3d at 1147.

33

c.   Local Interest in Having Localized Controversies Decided at Home

The next public interest factor requires an assessment and balancing of the interests of the local and foreign forums. *See Behrens*, 487 F. Supp. 3d at 332-33.  In the present case, Canada's interest far outweighs Pennsylvania's limited interest. [37]

Plaintiffs have explained that Pennsylvania has an interest in regulating its corporations through deterrence and ensuring that they are held responsible for defective products. *See* Compl. at ¶ 9.  However, courts have held that the *general* interest in deterrence will often be outweighed by the foreign forum's specific *local* interests in the case. *See, e.g.*, *Jennings*, 660 F. Supp. at 808. Indeed, the U.S. Supreme Court has rejected an argument that the interest in deterrence justifies retaining a case in a U.S. court where the foreign forum's interest is significant. *See Piper*, 454 U.S. at 260-61.

Here, any interest that Pennsylvania, or the United States generally, has in regulating the manufacturing of one of its corporations,[38] pales in comparison to the significant Canadian interests.  In this case, neither manufacturing nor design activities occurred in Pennsylvania—only the installation of a "Block 2" upgrade and minor relocation of a tethered sonar subsystem reeling machine in the back of the aircraft, and the related flight testing. *See* Lange Decl. at ¶¶ 8, 11. Indeed, the minor interest here of regulating installation of components is far outweighed by Canada's interest in protecting its citizens from the (alleged) misconduct of out-of-state

---

[37] Importantly, the CH-148 helicopter was designed and manufactured to the specifications of, and in collaboration with, the Canadian military. *See* Sept. 8 Lange Decl. at ¶ 4 (Pagano Decl., Ex. B).  It is not clear what interest, if any, Pennsylvania has in the design, development, and manufacture of a military helicopter that is exclusively owned and operated by a foreign country.

[38] Pennsylvania's interest is further limited since a substantial portion of the conduct relating to liability herein occurred outside of Pennsylvania. *See Fatkhiboyanovich v. Honeywell Int'l Inc.*, No. 04-4333, 2005 U.S. Dist. LEXIS 23414, at *19 (D.N.J. Oct. 5, 2005) ("While the United States has an interest in ensuring that products produced in this country by domestic companies are safe, New Jersey's interest in these actions is minimal because a substantial portion, if not all, of [defendant's] conduct relating to liability occurred outside New Jersey.").

corporations. Eastern District of Pennsylvania courts have held that a forum's interest in providing redress for its citizens outweighs the interest another forum may have in regulating its corporations. *See Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179, 193-94 (E.D. Pa. 2007) ("When [defendant's] conduct reaches and has consequences beyond the state's borders, it affects citizens of other states. When it does, the foreign state's interest in protecting its citizens outweighs Pennsylvania's regulatory concerns."); *see also Blain v. SmithKline Beecham Corp.*, No. 06-1247, 2007 U.S. Dist. LEXIS 103395, at *16 (E.D. Pa. Apr. 25, 2007) (applying this holding in public interest analysis for transfer of venue motion); *Wagner v. Olympus Am., Inc.*, No. 15-6246, 2016 U.S. Dist. LEXIS 68450, at *19-20 (E.D. Pa. May 24, 2016) (same). Other courts have employed similar analyses. *See, e.g.*, *Clerides*, 534 F.3d at 630; *Da Rocha*, 451 F. Supp. 2d at 1325. And while a defendant's home forum has an interest in providing a forum for redress for injuries suffered due to actions of its citizens, some courts have found that this maxim is due less weight where there is a "foreign plaintiff who was injured in a foreign land filing suit against an American defendant with extensive foreign dealings." *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 804 (7th Cir. 1997). Here, Sikorsky is not only engaged in a significant number of foreign dealings, but this case *arises out of* and is inextricably intertwined with such foreign dealings.

Canada also has a number of unique interests in this case. The accident involved, and Plaintiffs' claims center on, a military helicopter created specifically for, and in collaboration with, the Canadian Air Force. The CH-148 is owned and operated exclusively by the Canadian military, underscoring the important Canadian national interests concerned. *Cf. Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 609-10 (D.C. Cir. 1983) (considering American interests in a case arising out of an American military operation and finding that the United States' involvement "in every phase of the operation at issue" indicated a strong national interest in the

litigation).  Thus, Canada has a strong interest in ensuring that military aircraft produced by its contractors is safe.  Canada also has an interest in redressing the harm caused to its military members, especially where Plaintiffs have received benefits from the Canadian taxpayers after the decedents' passing. *Cf. Cooper v. Tokyo Elec. Power Co.*, 166 F. Supp. 3d 1103, 1136 (S.D. Cal. 2015) (noting the United States' "strong interest in providing compensation for its servicemembers and the ultimate costs of medical treatment lying with U.S. taxpayers").

Further, given the nature of the accident, which was highly publicized, the Canadian community has an interest in the outcome.  Indeed, this accident resulted in the deaths of six Canadian servicemembers during peacetime, so there is a special interest in resolving claims arising therefrom. *See Kolawole v. Sellers*, 863 F.3d 1361, 1372 (11th Cir. 2017) (recognizing Nigeria's "compelling interest in . . . resolving [the] claims considering they stem from one of the worst aviation disasters in the country's recent history").  A case involving such important concerns should be brought in a Canadian forum. *See Gulf Oil*, 330 U.S. at 509 (noting that in cases "touching the affairs of many persons, there is reason for holding the trial in their view and reach"); *see also Behrens*, 487 F. Supp. 3d at 335.

Canada also has an interest in this case by virtue of its involvement in the design, testing, and certification of the CH-148.  Indeed, because the CH-148 included new EFCS technology for which no certification standards existed, the Canadian DND, through its appropriate divisions, created a specific set of certification standards for this new technology.  Thus, Canada has a regulatory interest insofar as it not only certified the FBW system, but in fact created the certification standards in the first place. *See generally Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 616 (6th Cir. 1984) ("Though no single factor should be determinative in ruling on a *forum non conveniens* motion, the nature of the product and its status as regulated or not must be

considered.").  Courts have emphasized the importance of such regulatory interests in reviewing the various public interests at play. *See, e.g.*, *Dahl*, 632 F.2d at 1032-33; *Harrison v. Wyeth Laboratories Div. of Am. Home Prods. Corp.*, 510 F. Supp. 1, 4-5 (E.D. Pa. 1980), *aff'd*, 676 F.2d 685 (3d Cir. 1982); *Behrens*, 487 F. Supp. 3d at 334; *Jennings*, 660 F. Supp. at 808; *In re Union Carbide Corp. Gas Plant Disaster at Bhopal*, 634 F. Supp. 842, 863-66 (S.D.N.Y. 1986);.

Relatedly, due to its involvement in the design and development of the CH-148, the Canadian military's use of the helicopter, and the circumstances of the accident, Canada has expended significant resources in investigating the accident, its causes, and recommending changes to the CH-148—further signaling its important interests in this case. *See Behrens*, 487 F. Supp. 3d at 335-36; *Clerides*, 534 F.3d at 630; *Torreblanca*, 806 F. Supp. at 144.

It is apparent that Canada's interests are much more significant than Pennsylvania's interest in this case.  Indeed, given the sensitive nature of evidence likely to be implicated in this case, which could potentially compromise Canadian national security, Canada has a vested interest in the entire litigation process itself.  Relevant information and documents that would be produced during this litigation will pertain to a military helicopter currently in exclusive use by the Canadian Air Force, as well as documents concerning military personnel, training, and general policy. Although the Canadian government would have no way to enforce the *Canada Evidence Act* to bar the production of sensitive material already located in the United States in a proceeding here, as a matter of comity, we respectfully submit that how these sensitive materials would be handled should be left to a Canadian court.  The Canadian government's promulgation of Section 38, which seeks to protect sensitive materials from disclosure without prior authorization, reveals Canada's important interest in documents and evidence that pertain to its national security. *See* Binnie Aff. at ¶¶ 84-85 (Pagano Decl., Ex. J).  If the case were to proceed in Canada, where Plaintiffs and

decedents are from, and where the CH-148 was and still is in use, this would permit Canada to exercise its interest in its own national security by utilizing the *Evidence Act* to protect against disclosure of potentially injurious information. *See generally Ford v. Brown*, 319 F.3d 1302, 1307 (11th Cir. 2003) (noting that "foreign relations are implicated in the forum non conveniens calculus [such that] federal courts necessarily must analyze the interest that the foreign country has in the dispute, an analysis that may raise issues of international comity" (quoting *Esfield v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1312 (11th Cir. 2002))).

Thus, while Plaintiffs have gone to great lengths to frame this case as a simple products liability suit, they "cannot obscure the strength of the connection" between this action and Canada. *Air Crash over the Taiwan Strait*, 331 F. Supp. 2d at 1205. This connection, and thereby this public interest factor, weighs in favor of dismissal.

d. Appropriateness of Having the Trial of a Diversity Case in a Forum that is at Home with the Relevant Law that Governs the Case

The final public interest factor requires the court to consider what the relevant law governing the proceeding would be.[39] *See Behrens*, 487 F. Supp. 3d at 336-37; *Gulf Oil*, 330 U.S. at 509. Although application of foreign law does not mandate dismissal, it is an important factor that weighs in favor of it. *See Piper*, 454 U.S. at 260 n.29. The Supreme Court has explained that there is "appropriateness . . . in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle

---

[39] Importantly, the very existence of difficult choice of law questions and analysis weighs in favor of dismissal pursuant to *forum non conveniens*. *See Piper*, 454 U.S. at 251 ("The doctrine of *forum non conveniens*, however, is designed in part to help courts avoid conducting complex exercises in comparative law."). Indeed, courts have found that "the public interest factors point towards dismissal" where the court would be required to engage in extensive conflict of law issues. *Id.* (quoting *Gulf Oil*, 330 U.S. at 509). Nonetheless, a full choice of law analysis is included herein for completeness.

problems in conflicts of laws, and in law foreign to itself." *Gulf Oil*, 330 U.S. at 509.  Here, the applicable law is the law of Canada, [40] thus weighing in favor of dismissal.

Where claims are brought under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301, *et seq.*, the court should utilize a maritime choice of law analysis to determine the law that should govern the case. *See Biskos v. Seaways*, No. 90-2316, 1992 U.S. Dist. LEXIS 2260, at *15-16 (E.D. Pa. Feb. 25, 1992); *see also Cruz v. Chesapeake Shipping, Inc.*, 738 F. Supp. 809, 817 (D. Del. 1990) (explaining that the *Lauritzen* choice of law test "is applicable to all maritime actions").  The Third Circuit has articulated a two-step choice of law analysis in maritime actions. *See Neely v. Club Med. Mgmt. Servs. See* 63 F.3d 166, 182-83 (3d Cir. 1995).  The court must first determine whether there is prescriptive jurisdiction, by considering whether one of five enumerated factors applies. *See id.* at 182.  These factors are:  (1) injury to an American seaman or seaman with American dependents; (2) injury in American territory; (3) American defendants; (4) an American flagged ship; or (5) a contract clause specifying American law as applicable. *Id.* Second, the court should review the Supreme Court's choice of law factors articulated in the *Lauritzen-Romero-Rhoditis* ("*Lauritzen*") triad of cases to determine whether the exercise of prescriptive jurisdiction is reasonable under the circumstances. *See id.* at 182-83.

Here, there is prescriptive jurisdiction over defendants because all defendants are American. *See id.* at 186.  However, weighing the *Lauritzen* factors (step two of the *Neely* choice of law test) reveals that American interests in this case are far outweighed by the Canadian interests, and thus the exercise of prescriptive jurisdiction is not reasonable.

---

[40] "While the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action." *Ioannides v. Marika Mar. Corp.*, 928 F. Supp. 374, 379 (S.D.N.Y. 1996).

The Supreme Court has articulated eight relevant factors in the *Lauritzen* maritime choice of law analysis.[41]   These eight factors are:  (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or the domicile of the injured seaman; (4) allegiance of the defendant shipowner; (5) the place where the contract for employment was made; (6) the inaccessibility of a foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations. *Rhoditis*, 398 U.S. at 308-09.  This test is "not a mechanical one" and the list of factors is not intended to be exhaustive. *Id.*  Thus, courts do not need to consider all of the factors where such factors are not relevant. *See, e.g.*, *Papageorgiou v. Lloyds of London*, 436 F. Supp. 701, 703 (E.D. Pa. 1977) (applying only three relevant *Lauritzen* factors in deciding the choice of law prong of a *forum non conveniens* analysis).  Here, factors five and seven are of little relevance.  Factor five, which looks to the place of contract, is not relevant here as there is no direct contractual relationship between Plaintiffs and Sikorsky. *See Melgares*, 613 F. Supp. 2d at 251.  Factor seven—the law of the forum—has been deemed largely insignificant in the choice of law determination and is thus unlikely to weigh in favor of the application of either forum's laws.[42] *See id.*; *Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1247 (3d Cir. 1980); *see also Lauritzen*, 345 U.S. at 590-92.  Therefore, only six of the eight *Lauritzen* factors need to be reviewed herein. *See Melgares*, 613 F. Supp. 2d at 251.  Five of these six factors counsel in favor of applying Canadian law.

---

[41] The *Lauritzen* factors have been developed over time through three U.S. Supreme Court cases. *See generally Biskos*, 1992 U.S. Dist. LEXIS 2260, at *16.  In *Lauritzen v. Larsen*, the Supreme Court set forth the first seven factors for determining which jurisdiction's law should govern a maritime tort claim. 345 U.S. 571, 583-91 (1953).  Although *Lauritzen* involved Jones Act claims, the Court in *Romero v. International Terminal Operating Co.*, extended this choice of law analysis to general maritime claims. 358 U.S. 354, 382 (1959); *see also Biskos*, 1992 U.S. Dist. LEXIS 2260, at *15.  Finally, in *Hellenic Lines, Ltd. v. Rhoditis*, the Court added the eighth factor—the shipowner/employer's base of operations. 398 U.S. 306, 309 (1970).

[42] If the court analyzes this factor and finds it weighs in favor of applying American law, this factor is still "non-dispositive" even if not "irrelevant." *Neely*, 63 F.3d at 190 n.27.

The first *Lauritzen* factor—the place of the wrongful act—is neutral.  It is not clear what the exact location of the wrongful act was, as Plaintiffs allege multiple wrongful acts.  Indeed, the helicopter was designed and tested in collaboration with the Canadian government, thereby making it difficult to pinpoint the location of wrongful acts related to such claims.  The helicopter was also maintained in Canada once it was delivered to the Canadian Air Force.  Moreover, the accident itself occurred in Greece.  Thus, to the extent that the place of the wrongful act cannot be determined, this factor should be given less weight in this analysis. *See De Mateos v. Texaco Panama, Inc.*, 417 F. Supp. 411, 416 (E.D. Pa. 1976).

The second *Lauritzen* factor—the law of the flag—weighs in favor of applying Canadian law.  Here, the helicopter was exclusively owned and operated by the Canadian government.  Therefore, the flag is Canadian. *See Melgares*, 613 F. Supp. 2d at 251.  The third *Lauritzen* factor— the allegiance or the domicile of the injured—also weighs in favor of applying Canadian law.  The Third Circuit has explained that this is "one of the most important of the *Lauritzen* factors tending to show the reasonableness of applying American law." *Neely*, 63 F.3d at 195; *see also Das Chagas v. Sedco, Inc.*, 557 F. Supp. 442, 444 (E.D. Pa. 1983) (noting that "each nation has a legitimate interest that its permanent inhabitants be not maimed or disabled" (quoting *Lauritzen*, 345 U.S. at 586)).  All of the Plaintiffs are domiciled in Canada.  Moreover, all of the decedents were Canadian domiciliaries.  Thus, this factor weighs in favor of applying Canadian law. *See Melgares*, 613 F. Supp. 2d at 251.

The fourth *Lauritzen* factor—the allegiance of the defendant shipowner—weighs in favor of applying Canadian law.  Here, the helicopter was owned by the Canadian government/military. *See id.*  The sixth *Lauritzen* factor—the inaccessibility of the foreign forum—also weighs in favor of applying Canadian law.  Canada is undoubtedly an accessible and convenient forum for

Plaintiffs, all of whom reside therein. *See id.*  Moreover, to the extent that Sikorsky is willing to submit to jurisdiction in Canada, it is a convenient forum for defendants as well. *See id.*  Finally, the eighth *Lauritzen* factor—the shipowner's/employer's base of operations—weighs towards applying Canadian law.  The owner of the helicopter and decedents' employer was the Canadian DND. *See id.*

A thorough review of the *Lauritzen* factors reveals that at least five of the six relevant factors weigh in favor of applying Canadian law:  the helicopter's flag is Canadian; the decedents and Plaintiffs are all Canadian; the helicopter's owner is Canadian; Canada is an accessible forum for all parties; and the Canadian government has its base of operations in Canada.  Thus, despite the existence of prescriptive jurisdiction over Sikorsky, application of American law is not reasonable given this case's extensive connections to Canada that far outweigh the limited American ties. *See, e.g.*, *Chirinos de Alvarez*, 613 F.2d at 1247 (finding American law inapplicable where only two *Lauritzen* factors support the application of U.S. law); *De Alvarez v. Creole Petroleum Corp.*, 462 F. Supp. 782, 786-88 (D. Del. 1978) (denying application of U.S. law where only one *Lauritzen* factor counseled in favor of American law); *Papageorgiou*, 436 F. Supp. at 703 (finding Greek law applicable where three of the three relevant *Lauritzen* factors weighed in favor of Greek law).

Moreover, because the *Lauritzen* test is not meant to be mechanical, the factors are to be accorded weight in light of the national interest served by allowing American law. *See generally Rhoditis*, 398 U.S. at 309; *Neely*, 63 F.3d at 182.  Here, as explained above, the United States has, at best, an interest in preventing its corporations from committing torts.  Canada's interests are much greater—namely, protecting its military servicemembers, ensuring that military aircraft designed, tested, and certified in accordance with its military's specifications is safe, and ensuring

the continued safe operation and maintenance of such military aircraft. *See, e.g.*, *Chirinos de Alvarez*, 613 F.2d at 1247 ("Most importantly, the Venezuelan concerns are considerable; the United States interests pale in comparison."); *Biskos*, 1992 U.S. Dist. LEXIS 2260, at *17-18 ("The interests of the United States in this case pale in comparison to those of foreign sovereigns, and, in particular, to the interests of Greece.").

Therefore, the law applicable to this case is Canadian. Since proceeding in this court will require application of foreign law, the final public interest factor weighs in favor of dismissing this case for *forum non conveniens*. *See generally Windt*, 529 F.3d at 193.

## V.     **CONCLUSION**

Plaintiffs' claims present "a textbook case for immediate *forum non conveniens* dismissal." *Sinochem*, 549 U.S. at 435. Canada is both an adequate and convenient forum for Plaintiffs, who are all Canadian citizens, to adjudicate their claims. Thorough balancing of the public and private interests reveals that any minor benefit for Plaintiffs in the Eastern District of Pennsylvania is far outweighed by the inconvenience Defendants will suffer in the United States in establishing their defenses, obtaining all evidence, and presenting trial testimony of key non-parties. Indeed, the balance of factors indicates that litigating this claim in Plaintiffs' home forum will be significantly more convenient. Defendants respectfully request that this Court grant their Motion to Dismiss for *forum non conveniens*.

Dated:  September 8, 2023          */s/ Ralph V. Pagano*
                                              Ralph V. Pagano (PA # 68900)
                                              FITZPATRICK, HUNT & PAGANO, LLP
                                              12 East 49th Street, 34th Floor
                                              New York, NY 10017
                                              Tel:  (212) 937-4002
                                              Fax:  (212) 937-4050
                                              Ralph.pagano@fitzhunt.com


                                              */s/ John C. McMeekin II*
                                              John C. McMeekin II (PA # 81250)
                                              RAWLE & HENDERSON LLP
                                              Centre Square West
                                              1500 Market Street, 19th Floor
                                              Philadelphia, PA 19102
                                              Tel:  (215) 575-4324
                                              Fax:  (215) 563-2583
                                              Jmcmeekin@rawle.com


                                              Attorneys for Defendants Sikorsky Aircraft
                                              Corporation, Helicopter Support, Inc., and Sikorsky
                                              International Operations, Inc.