**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOANNE COUSINS, on behalf of the** | : | **CIVIL ACTION** |
| **ESTATE OF MATTHEW COUSINS and** | : | |
| **on behalf of his DOHSA beneficiaries,** | : | |
| **TANYA COWBROUGH, on behalf of the** | : | |
| **ESTATE OF ABBIGAIL COWBROUGH** | : | |
| **and on behalf of her DOHSA** | : | |
| **beneficiaries, KYLE HAGEN, on behalf** | : | |
| **of the ESTATE OF KEVIN HAGEN and** | : | |
| **his DOHSA beneficiaries, AMANDA** | : | |
| **MacDONALD, on behalf of the ESTATE** | : | |
| **OF BRENDEN IAN MacDONALD, and on** | : | |
| **behalf of his DOHSA beneficiaries,** | : | |
| **KATHRYN BOWEN, on behalf of the Est.** | : | |
| **of Maxime Miron-Morin and on behalf** | : | |
| **of his DOHSA beneficiaries, and** | : | |
| **MICHAEL CUSTANCE, on behalf of the** | : | |
| **ESTATE OF MATTHEW PYKE, and on** | : | |
| **behalf of his DOHSA beneficiaries** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SIKORSKY AIRCRAFT COFRPORATION** | : | |
| **doing business as Sikorsky, a** | : | |
| **Lockheed Martin Company,** | : | |
| **HELICOPTER SUPPORT, INC., doing** | : | |
| **business as Helicopter Support, Inc., a** | : | |
| **Lockheed Martin Company and** | : | |
| **SIKORSKY INTERNATIONAL** | : | |
| **OPERATIONS, INC., doing business as** | : | |
| **Sikorsky International Operations, a** | : | |
| **Lockheed Martin Company** | : | **NO. 23-2629** |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                    **September 30, 2024**

Plaintiffs, representatives of the estates of six Canadian military members who died in a helicopter crash during a training exercise off the coast of Greece, brought this products liability action under the Death on the High Seas Act, 46 U.S.C. § 30301 *et seq.*, against defendant, Sikorsky Aircraft Corporation ("Sikorsky"), a United States corporation

that designed and manufactured the helicopter. Sikorsky has moved to dismiss on *forum non conveniens* grounds.[1] It asserts that the case should be dismissed because the accident killed Canadian citizens, was investigated by Canadian authorities, and the helicopter was maintained, owned, and operated by the Canadian Air Force, which collaborated in the design process. Sikorsky maintains that evidence critical to its defense is in Canada and the claims implicate Canada's national security interests. Opposing the motion, the plaintiffs contend that the United States is the appropriate venue because the helicopter was designed, manufactured, and assembled by Sikorsky in its United States facilities; the Electronic Flight Control System (EFCS) that they claim caused the crash was installed in the helicopter in Coatesville, Pennsylvania; and plaintiff's decedent Brenden MacDonald conducted the initial flight test at Sikorsky's Coatesville facility.

We hold that Sikorsky has not shown that it will suffer oppression and vexation out of all proportion to the plaintiffs' convenience if the case is litigated in this United States court. Balancing the private and public interest factors does not weigh in favor of overriding the plaintiffs' choice of forum which was based on access to the evidence critical to proving their claims. Therefore, we shall deny the motion to dismiss.

### Background[2]

The fatal helicopter crash occurred on April 29, 2020, off the coast of Greece.[3] During a NATO training flight exercise, the helicopter's automated flight system overrode

---

[1] Defs.' Mem. of L. in Supp. of their Mot. to Dismiss Pursuant to *Forum Non Conveniens*, ECF No. 16-1 ["Sikorsky's Br."].

[2] The facts are drawn from the Complaint as developed in discovery.

[3] Compl. ¶ 1, ECF No. 1.

the pilot's manual controls, causing the helicopter to nosedive into the sea.

Plaintiffs are Canadian citizens. Five reside in Nova Scotia and one resides in British Columbia.[4] The decedents were Canadian military members.

Sikorsky Aircraft Corporation, a Lockheed Martin company, designs, manufactures, assembles, repairs, services, distributes, markets, and sells helicopters.[5] It performed work on the CH-148 helicopter in Florida, Connecticut, Colorado, Minnesota, Maryland, Alabama, and Pennsylvania.[6] The site of final production was Coatesville, Pennsylvania, a facility dubbed as the "Home of the CH-148."[7]

The Canadian Department of National Defense (DND) submitted requests for proposal (RFP) to Sikorsky and other helicopter manufacturers to build the CH-148 Cyclone to replace its military maritime helicopter fleet.[8] The RFP included a Maritime Helicopter Requirements Specification (MHRS) that described the type of equipment and capabilities required.[9] The Statement of Operating Intent (SOI) explained how the Air Force intended to use the helicopter.[10]

---

[4] *Id.* ¶¶ 33–38.

[5] *Id.* ¶¶ 39–40. The plaintiffs also name as defendants Sikorsky International Operations, Inc. and Helicopter Support, Inc., subdivisions of Sikorsky Aircraft Corporation. At oral argument, defense counsel stated that the Sikorsky subsidiaries were not involved in the design, manufacture, and testing of the CH-148. Plaintiffs' counsel stated plaintiffs would be willing to work out a stipulation dismissing the extraneous entities. We use "Sikorsky" to refer to Sikorsky Aircraft Corporation as the only defendant responsible for the CH-148.

[6] *Id.* ¶¶ 8, 10.

[7] *Id.* ¶¶ 9–10.

[8] *Id.* ¶¶ 65–66.

[9] Flight Safety Investigation Report § 1.18.5 (attached as Ex. A to Sikorsky's Br.), ECF No. 16-4 ["FSIR"].

[10] *Id.* § 1.18.5.

The RFP did not specify the EFCS.[11] Sikorsky proposed inclusion of the EFCS in its bid, suggesting it would reduce pilot workload.[12] Sikorsky prepared a Maritime Helicopter System Specification (MHSS) describing fly-by-wire and EFCS capabilities to be incorporated into the contract.[13]

The DND awarded Sikorsky the contract in November 2004.[14] Sikorsky delivered the first CH-148 helicopter in 2015.[15] After installation of final upgrades, it was certified as operational in 2018.[16]

Sikorsky designed the CH-148 fleet to include an EFCS, a "fly-by-wire" automated flight control program.[17] To reduce the pilot's workload, the EFCS pairs with the helicopter's Flight Director system to automate flight controls.[18] The Flight Director system sends signals to adjust flight controls based on a set speed, altitude, and direction.[19] On a traditional helicopter, the pilot receives inputs from the Flight Director and controls the helicopter actuators mechanically. In a fly-by-wire system, the EFCS uses computers to interpret the Flight Director inputs and manipulates the actuators automatically.[20] When

---

[11] Compl. ¶ 65.

[12] Id. ¶¶ 12–13, 97.

[13] Id. ¶ 13; FSIR § 1.18.9.

[14] FSIR § 1.18.7.

[15] Compl. ¶ 67.

[16] CH-148 Cyclone, Lockheed Martin https://www.lockheedmartin.com/en-us/products/sikorsky-ch148-cyclone-helicopter.html (last visited Sept. 30, 2024) ("The Canadian government approved initial operational capability of the CH-148 Cyclone helicopter in June 2018."); Decl. of Roger D. Lange in Supp. of Sikorsky's Mot. to Dismiss ¶¶ 9–10 (attached as Ex. C to Sikorsky's Br.), ECF No. 16-4 ["Lange Decl."].

[17] Compl. ¶ 70.

[18] Id. ¶ 97.

[19] Id. ¶¶ 3, 98.

[20] Id. ¶ 3.

"coupled" to the Flight Director, the EFCS controls the aircraft settings.[21] To regain control, the pilot "decouples" the EFCS from the Flight Director.[22] He can then manually override the EFCS.[23]

Sikorsky originally developed the fly-by-wire capability for commercial aircraft, the S-92F, for use in the United States.[24] The United States Federal Aviation Administration (FAA) initiated a certification process of the technology. Sikorsky partnered with BAE Systems,[25] a Virginia based company whose New York subsidiary developed the Flight Control Computers used in Sikorsky fly-by-wire helicopters, including the CH-148.[26] Due to lack of civilian customer interest, Sikorsky ended its fly-by-wire commercial aircraft project.[27] Consequently, the FAA ceased its certification process.[28]

After the Canadian Air Force approved Sikorksy's proposal, the Directorate of Technical Airworthiness and Engineering Support (DTAES) division of the Canadian Technical Airworthiness Authority took over as the certifying authority.[29] DTAES developed special conditions for use of the fly-by-wire technology in military helicopters.[30]

---

[21] *Id.* ¶ 99.

[22] *Id.* ¶ 99.

[23] *Id.* ¶¶ 100–01.

[24] *Id.* ¶ 12; FSIR § 1.18.10.

[25] BAE Systems is a nonparty.

[26] S-92 Fly-by-Wire Advanced Flight Control System Report, at 1 (attached as Ex. K to Pls.' Mem. or L. in Opp'n to Defs.' Mot. to Dismiss Pursuant to *Forum Non Conveniens*, ECF No. 33 ["Pls.' Opp'n"]), ECF No. 33-4.

[27] Compl. ¶ 12; FSIR § 1.18.10.

[28] FSIR § 1.18.10.

[29] *Id.* § 1.18.11.

[30] *Id.* § 1.18.14.

DTAES tested the fly-by-wire system in West Palm Beach and in Canada.[31]

The CH-148 fleet was designed at Sikorsky's Stratford, Connecticut facility.[32] It was manufactured in West Palm Beach, Florida, and Stratford, Connecticut.[33] As part of the DTAES certification process, Sikorsky tested the CH-148 at its West Palm Beach facility.[34] It also conducted tests in Shearwater, Canada.[35] The helicopter was initially assembled and tested in the West Palm Beach facility.[36] In 2015, Sikorsky delivered the fatal helicopter to the Canadian military.[37] It was one of eight helicopters in the initial delivery ("Block 1").[38]

In September 2016, the Canadian military returned the "Block 1" helicopters to Sikorsky for planned "Block 2" upgrades to the software and structural systems.[39] Sikorsky installed the "Block 2" upgrades at its facility in Coatesville, Pennsylvania.[40] It also test flew the "Block 2" CH-148 in Coatesville.[41] It returned the upgraded helicopters to the Canadian military in 2018.[42] Sikorsky closed its Coatesville facility in March 2022.[43]

---

[31] Lange Decl. ¶ 5.

[32] *Id.* ¶ 4.

[33] *Id.* ¶ 6.

[34] *Id.* ¶ 5.

[35] *Id.* ¶ 5.

[36] *Id.* ¶ 7.

[37] Compl. ¶¶ 48, 67.

[38] *Id.* ¶ 48.

[39] Lange Decl. ¶ 8.

[40] *Id.* ¶ 9.

[41] *Id.* ¶ 9. Sikorsky employees and Canadian Air Force members, including decedent Brenden MacDonald, tested the helicopters together. *Id.* ¶ 12.

[42] Compl. ¶ 14.

[43] Lange Decl. ¶ 13.

On April 29, 2020, the decedents were conducting Canadian Air Force training exercises in the CH-148 helicopter above the Ionian Sea off the coast of Greece.[44] The pilot attempted a "Return-to-Target" (RTT) maneuver.[45] In an RTT, the helicopter reverses course to return to a target that it has flown past.[46] The maneuver requires ascending, sharply turning, and then descending to the starting altitude.[47] The pilot uses pedal and cyclic inputs[48] to change airspeed and pitch attitude (directing the nose up or down).[49]

In the training exercise while performing the RTT, the pilot did not decouple the EFCS from the Flight Director, which had a set airspeed of 140 knots and altitude of 50 feet above the ocean.[50] At the peak of the climbing turn, the EFCS overrode the pilot's manual commands and pitched the nose downward.[51] The helicopter plunged into the sea, killing all on board.[52]

After investigating, Sikorsky attributed the accident to a phenomenon called Command Model Attitude Bias.[53] The phenomenon occurs when the Flight Director is coupled to the EFCS and the pilot attempts to make significant changes to the speed,

---

[44] FSIR §§ 1.1.1–1.1.5.

[45] Compl. ¶ 15; FSIR § 1.1.8.

[46] Compl. ¶ 106.

[47] Id. ¶ 106.

[48] Pedal and cyclic inputs control the direction of the helicopter, where the nose points, and its ascent or descent.

[49] Compl. ¶ 15.

[50] Id. ¶ 107.

[51] Id. ¶ 109

[52] Id. ¶ 5.

[53] Id. ¶ 109; FSIR Synopsis, §§ 1.16.17–1.16.24.

altitude, and attitude through manual pedal and cyclic inputs.[54] The EFCS tracks the difference between the actual airspeed, altitude, and pitch attitude and the preset airspeed, altitude, and attitude.[55] Near the peak of the climbing turn as the airspeed decreases, the EFCS adjusts attitude to build airspeed by abruptly pitching the nose downward.[56] This caused the incident helicopter to pitch downward and rapidly descend into the sea.[57]

It is against this background and these facts that we must decide whether to grant Sikorsky's motion to dismiss the action on *forum non conveniens* grounds.

### Analysis

Under the *forum non conveniens* doctrine, a district court may dismiss an action where a court in another country is the more appropriate and convenient forum for adjudicating the controversy. The plaintiff's choice of forum, which should rarely be disturbed, may be outweighed when trial in the chosen forum would cause the defendant "oppressiveness and vexation . . . out of all proportion to plaintiff's convenience" or when trial in the chosen forum would be inappropriate in light of "the court's own administrative and legal problems." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (quoting *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)).[58]

---

[54] Compl. ¶ 16.

[55] *Id.* ¶ 108.

[56] *Id.* ¶ 109.

[57] *Id.* ¶ 109.

[58] The relevant home forum for purposes of the *forum non conveniens* analysis is the United States. *Wilson v. Island Seas Investments, Ltd.*, 590 F.3d 1264, 1271 (11th Cir. 2009); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco, P.L.C.*, No. 03 CIV. 0200, 2003 WL 21180421, at *9 (S.D.N.Y. May 20, 2003) (citing *DiRienzo v. Phillip Services Corp.*, 294 F.3d 29, 31–32 (2d Cir.2002)).

The *forum non conveniens* analysis consists of three steps. First, we determine whether the proposed alternative forum is adequate. Second, if it is, we consider how much deference to afford the plaintiff's chosen forum. Third, we balance the relevant public and private interest factors. If, after balancing these factors, we find "that trial in the chosen forum would result in oppression or vexation to the defendant out of all proportion to the plaintiff's convenience," we may dismiss the case. *Windt v. Qwest Commc'ns Int'l, Inc.,* 529 F.3d 183, 190 (3d Cir. 2008); *Piper*, 454 U.S. at 255.

The defendant has the burden of showing that there is an alternative forum and "the private and public interest factors weigh heavily on the side of dismissal." *Lacey v. Cessna Aircraft Co.,* 862 F.2d 38, 42 (3d Cir. 1988). The burden of persuasion is significant. *Id.*

### Adequacy of the Alternative Forum in Canada

The alternative forum is adequate if the defendants are amenable to process and the plaintiffs' claims are cognizable there. *Piper Aircraft*, 454 U.S. at n.22. If the statute of limitations would bar the claim, the alternate forum is inadequate. *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001). If the defendant cannot be served process, the forum is not adequate. *Piper,* 454 U.S. at n.22; *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003). Extreme delays in the alternate forum can also render it inadequate. *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1227–28 (3d Cir. 1995).

So long as the defendants are subject to service and the foreign tribunal recognizes some form of redress, the alternative forum is considered adequate. *See Piper,* 454 U.S. at n.22; *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 136 (4th Cir.

2022) (holding that a Dutch court's inability to effectively adjudicate American trademark law claims disqualified it as an adequate forum). This is so even where certain theories of recovery or damages more favorable to the plaintiff are unavailable. For example, the Supreme Court held, in *Piper*, that although the foreign forum did not provide a strict liability cause of action and the potential damages were less, the forum was not inadequate. 454 U.S. at 254–55.  There was "no danger that they [would] be deprived of any remedy or treated unfairly." *Id.* at 255.

That the substantive law in the alternative forum is less favorable to the plaintiffs does not render that forum inadequate. *Piper*, 454 U.S. at 247, 254–55. A difference in the substantive law is not given substantial weight. *Id.* at 247. However, if the alternative forum does not permit litigation of the dispute or the remedy provided is "so clearly inadequate or unsatisfactory that it is no remedy at all," the difference in the law may be given substantial weight. *Trotter v. 7R Holdings, Inc.*, 873 F.3d 435, 440 (3d Cir. 2017) (quoting *Piper*, 454 U.S. at 254).

The plaintiffs' products liability claims are cognizable in the Canadian courts.[59] Nova Scotia[60] recognizes causes of action for design defect, manufacturing defect and failure to warn.[61] Suit may be brought for the benefit of the estate of a deceased person under the Survival of Actions Act and for the benefit of certain family members of the

---

[59] Aff. of Hon. Ian Binnie, C.C., K.C. ¶¶ 22–26 (attached as Ex. J to Sikorsky's Br.), ECF No. 16-4 ["Binnie Aff."].

[60] The parties agree that if the litigation were to proceed in Canada, the relevant forum would be Nova Scotia, where five of the six plaintiffs reside and the Canadian military base which housed the CH-148 is located.

[61] *Id.* ¶¶ 25–26.

deceased under the Fatal Injuries Act.

There is no question that the law in Nova Scotia is less favorable to the plaintiffs. There is no strict liability cause of action and no punitive damages available. Nonetheless, because Sikorsky is amenable to process and the plaintiffs can obtain relief there, the plaintiffs will not be shut out of the Canadian court if the case is litigated there. Thus, Nova Scotia is an adequate alternative forum.

### Deference Due Plaintiffs' Choice of Forum

Having determined that Nova Scotia is an adequate alternative forum, we assess the deference to accord the plaintiffs' choice of forum. A strong presumption of convenience exists in favor of a domestic plaintiff's chosen forum. But, a foreign plaintiff's choice deserves less deference. *Windt*, 529 F.3d at 190 (quoting *Piper Aircraft*, 454 U.S. at 256). A foreign plaintiff can bolster the choice by making a strong showing of convenience. *Id.* (quoting *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 634 (3d Cir. 1989)).

In determining the deference due the foreign plaintiffs' choice of forum, we consider the circumstances of the litigation, including whether the chosen forum has a substantial relationship to the parties and the events involved in the case. *Compare Lony*, 886 F.2d at 634 (fact that the foreign plaintiff's chosen forum was the defendant's state of incorporation, where the defendant's corporate headquarters, headquarters of the division in question, research laboratories and bulk of liability evidence were located, and where the conduct that caused the alleged injury occurred, had "considerable weight in showing that the plaintiffs' choice was based on convenience"), *with Windt*, 529 F.3d at 191 (where chosen forum was not home of two defendants, evidence was not

concentrated there and an insubstantial amount of conduct gave rise to the dispute there, and plaintiffs were Dutch residents serving as representatives of an insolvent Dutch company, district court properly accorded the plaintiffs' choice of forum a low degree of deference).

Sikorsky argues that plaintiffs' choice of forum should be afforded limited deference because they are Canadian citizens and their only connection to Pennsylvania is that their attorneys are located in this district.[62] It also contends that the plaintiffs are forum shopping for a higher damages award and litigation advantages unavailable in Canada.[63] Finally, it argues that because Sikorsky closed its Coatesville facility in 2021, there are no potentially relevant documents subject to litigation in this district.[64]

The plaintiffs counter that their choice of forum should be given significant weight. They contend that critical evidence necessary to prove their case is in the United States where the CH-148 was designed, manufactured, and assembled.[65] They accuse Sikorsky of wanting to move the case to Canada for their own forum shopping reasons. They urge us to view the domestic defendant's motion for dismissal for *forum non conveniens* with skepticism.[66] They cite *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 75 (2d Cir. 2001) (finding because "defendants also may move for dismissal under the doctrine of *forum non conveniens* not because of genuine concern with convenience but because of similar

---

[62] Sikorsky's Br. 19.

[63] *Id.* at 19.

[64] *Id.* at 20.

[65] Pls.' Opp'n 30.

[66] *Id.* at 31.

forum-shopping reasons," courts should "arm themselves with an appropriate degree of skepticism in assessing whether the defendant has demonstrated genuine inconvenience and a clear preferability of the foreign forum"); *Frederiksson v. HR Textron,Inc.,* 484 F. App'x 610, 612–13 (2d Cir. 2012) ("[W]hen an American defendant claims that a foreign forum is more convenient than a home forum, some suspicion of forum shopping [on the defendant's part] must arise."); *In re Air Crash at Taipei, Taiwan on Oct. 31, 2000*, 2003 WL 25781233, at *1 (C.D. Cal. Mar. 27, 2003) ("[C]ourts generally view with suspicion [FNC motions] when brought by a domestic defendant.").

A foreign plaintiff's choice of forum is still entitled to some weight. See *Lacey*, 932 F.2d at 175. Although a foreign plaintiff's choice typically deserves less deference, there is a presumption that it is for convenience. "The focus of the deference inquiry. . .is on convenience, not on the particular significance of a party's residence or citizenship or a party's ability to invoke a United States court's jurisdiction." *Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 875 (3d Cir. 2013).

Here, the most significant liability evidence is in the United States, including evidence of the design and manufacture of the EFCS system and the CH-148 helicopter. Although Sikorsky's facilities in different states played a part, essential activities took place at its Coatesville plant. The Coatesville facility was touted as the "home of the CH-148."[67] Plaintiffs contend that the connection to the Eastern District of Pennsylvania is "critical" because "the defective product was completed here and distributed into the

---

[67] Compl. ¶ 8.

stream of commerce from the Eastern District."[68] They emphasize that Sikorsky upgraded the helicopter's software and structural systems at the Coatesville facility.[69] That work took two years.[70]

That plaintiffs' counsel's office is located in the forum is usually discounted in considering the deference to be given to plaintiffs' choice of forum. *Kisano*, 737 F.3d at 876. However, the choice is entitled to more deference where relevant evidence and the defendant are in the forum. In that case, the plaintiffs' choice of forum is driven by consideration of convenience, increasing the deference given the foreign plaintiffs. *See Lony*, 886 F.2d at 634.

In summary, the foreign plaintiffs' choice is not entitled to a strong presumption of convenience. Nevertheless, because the defendant has a connection to the plaintiffs' chosen forum and the plaintiffs have demonstrated that their choice was based on convenience, their choice deserves more deference than is typically given a foreign plaintiff. Therefore, we shall accord the foreign plaintiffs' choice of forum less deference than is given to a domestic plaintiff and more than is usually given a foreign plaintiff.

### Private and Public Interest Factors

Having determined that Canada is an adequate foreign forum and that the plaintiffs' choice of forum is entitled to more deference than typically given to a foreign plaintiff, we must weigh and balance the private and public interest factors. The private interest factors consider the convenience of the litigants, and the potential

---

[68] Pls.' Opp'n 17.

[69] Compl. ¶ 48.

[70] Pls.' Opp'n 17.

oppressiveness and vexation to the defendant. The public interest factors consider the demands on the court system in each forum and the burden on the respective factfinder or jury. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09 (1947).

*Private Interest Factors*

The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses; (3) a view of the premises, if appropriate; and (4) other practical problems that make trial of a case easy, expeditious and inexpensive. *Windt*, 529 F.3d at 189 (quoting *Gilbert*, 330 U.S. at 508).

The first and second factors—access to sources of proof and availability of compulsory process—are intertwined.  Both go to marshalling the evidence.

The fatal incident happened in international waters off the coast of Greece. The decedents resided in Canada and were members of the Canadian military. The CH-148 was designed and manufactured for the Canadian National Defense. It was designed and manufactured in facilities in Florida, Connecticut, and Pennsylvania. It was upgraded, tested, and deemed operational in Coatesville, Pennsylvania.

Given these connections, which forum affords easier and more convenient access to the evidence? Will litigating in this forum cause the defendant oppression and vexation? In answering these questions, we consider what is the more significant evidence and the more contested evidence.

The focus of the liability inquiry is on what was done in the United States, not in Canada. Sikorsky designed, manufactured and delivered the helicopter in the United States. It installed final upgrades to the operation system and tested the helicopter in

Coatesville.

Whether the case is litigated here or in Canada, both sides will have difficulties getting the evidence they need. The difficulties are likely to cause delays and require more effort than is encountered in a case having connections to only one nation. The obstacles are not insurmountable.

The plaintiffs blame the cause of the crash on the fly-by-wire technology, a component of the CH-148 that Sikorsky promoted and incorporated into the navigation system. The plaintiffs' design defect claim centers on the EFCS's Command Model Attitude Bias.  Sikorsky does not disagree.

The critical facts regarding the design of the helicopter and the EFCS are the most significant in determining liability. Witnesses include former and current Sikorsky employees and BAE Systems employees. They reside in the United States. Experts opining on the design, manufacturing, and testing are also based in the United States.[71]

Those involved in the design and development of the CH-148 worked in Sikorsky's facilities in Florida, Connecticut, and Pennsylvania. The two-year upgrade to the CH-148 was performed at the Coatesville facility. The Block 2 upgrade, the final production step, was completed there.  At oral argument, defense counsel confirmed that the Block 2 upgrades were part of the production process and that the upgrades included "mission critical components."  Counsel verified that the CH-148 was delivered from Coatesville following the Block 2 upgrades, the final step deeming the helicopter operational before Canada certified it.[72] Before that, the helicopter was not capable of landing on an aircraft

---

[71] *Id.* at 39–40.

[72] According to Lockheed Martin's website, the "Canadian government approved initial operational

carrier as contemplated and specified.[73]

The BAE Systems employees who worked on the EFCS at its New York facility are undoubtedly essential witnesses. Their knowledge of the development and construction of the EFCS that Sikorsky incorporated into the helicopter goes to the heart of the cause of the crash. What BAE revealed to Sikorsky about the EFCS's capabilities, limitations, and testing is critical evidence.

BAE is currently a non-party. Its records and employees are beyond the reach of the Canadian court.

Sikorsky offers to make available in Nova Scotia employees "under its control." This offer is not a guarantee that the witnesses who worked on the design and have knowledge of its development will be available in Nova Scotia. First, former employees possessing this essential knowledge are not under Sikorsky's control. Second, the Canadian forum is not convenient for current and former employee witnesses. According to Sikorsky, witnesses who worked on the project in Coatesville either retired or were transferred to other Sikorsky facilities in the United States. They would have to travel beyond the border if the case is litigated in Nova Scotia. Paying the expenses of

---

capability of the CH-148 Cyclone helicopter in June 2018." CH-148 Cyclone, Lockheed Martin, https://www.lockheedmartin.com/en-us/products/sikorsky-ch148-cyclone-helicopter.html (last visited Sept. 30, 2024). Sikorsky's Project Engineer Principle Roger Lange confirmed that the Canadians conducted final testing and approval after the CH-148 underwent the Block 2 upgrade at Coatesville. Lange Decl. ¶¶ 9–10.

[73] To minimize any connection to its Coatesville facility, Sikorsky emphasizes that the Coatesville facility closed more than two years ago. Documents that were there have been moved to other facilities. Sikorsky's Br. 22. Paper copies of relevant Sikorsky documents may have been transferred to other Sikorsky facilities. That does not present an inconvenience. They are available wherever they are. The days when producing documents required searching for and retrieving documents from boxes of records are gone. Now, one may locate responsive documents with the stroke of a computer key. Documents are regularly transferred electronically intra-company from one location to another. Thus, the location of documents does not inform the ease of access to evidence analysis.

Sikorsky's former and current employees does not eliminate the inconvenience of their travelling to and from Canada.  Third, former employees involved in the CH-148 program cannot be compelled to appear and testify in Nova Scotia. In the United States, they can be subpoenaed.

Another hurdle in obtaining access to evidence is governmental limitations on disclosure of national defense related information. Canada has restrictions shielding sensitive information from discovery. The United States has its protections. Neither absolutely forbids release of the information. Both impose strict requirements a party must satisfy before the information sought can be released. Both involve a lengthy process.

Section 38 of the Arms Control Export Act authorizes the executive branch of the United States government to control the export and import of defense products and services, including technical data, "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Pursuant to this authority, the Department of State has issued the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120-130 (1995). The US Munitions List (USML), 22 C.F.R. § 121, enumerates the articles, products, or services subject to ITAR restrictions.

Plaintiffs have submitted an affidavit from attorney Johanna Reeves, whose practice concentrates on advising United States companies on export and import matters subject to national security regulations, including ITAR regulations. Reeves opines that "because the CH-148 was designed and manufactured for a military application, the aircraft and some of the major parts and components (e.g., the EFCS) are subject to the

ITAR."[74]

The Directorate of Defense Trade Controls (DDTC) is tasked with managing the ITAR regulations, including reviewing requests to export technical data. The release of technical ITAR-controlled data from the United States to Canada or the retransfer of data within Canada requires authorization from the DDTC, typically in the form of a license.[75]

Reeves enumerates the three types of DDTC authorizations: licenses, agreements, and exemptions. Licenses "authorize[] the export of a defined set of items to a defined group of end-users, for a specific purpose and is typically issued for a 4-year period."[76] Reeves notes that the DDTC generally does not issue a license for technical data.[77] Agreements, such as a Technical Assistance Agreement ("TAA"), allow the DDTC to approve the export of defense services or the exchange of technical information in advance.[78] TAAs are typically issued in arbitration to allow the parties to exchange technical information to resolve disputes.[79] Applications for TAAs require detailed descriptions of the information to be transmitted and signatures of the foreign party recipients.[80] All recipients must be specifically named in the agreement as licensees, and any other parties that may receive the information must be named as sublicensees.[81]

---

[74] Decl. of Johanna Reeves ¶ 16 (attached as Ex. G to Pls.' Opp'n), ECF No. 33-2 ["Reeves Decl."].

[75] *Id.* ¶¶ 9-10.

[76] *Id.* ¶ 15.

[77] *Id.*

[78] *Id.* (citing 22 C.F.R. § 120.57(e)).

[79] *Id.*

[80] *Id.*

[81] *Id.*

Exemptions allow for exports without a license for narrowly defined articles or data.[82]

Reeves concludes that the licensing and agreement processes may cause a "significant time delay" because each requires review by bureaus within the Department of State, the Department of Defense, and other U.S. government agencies with an interest in the exchange of the information.[83] The authorization process applies to both initial export requests and the retransfer and reexport of U.S. defense articles, services, or technical data within Canada.[84] Reeves notes that the State Department "may deny an application for ever-shifting national security or foreign policy reasons."[85]

Plaintiffs sent a preservation request to the DND for the recovered portion of the wreckage, the flight recorder data, and cockpit recording.[86] DND representative Captain Marie-Elaine Bernier advised that the wreckage and data are ITAR-restricted.[87] Captain Bernier explained that Sikorsky is the only point of contact for handling the evidence and that "it will have to be disposed in the [United States]."[88]

Sikorsky labeled 4,500 of the 9,500 documents produced in the *forum non conveniens* discovery as "export controlled."[89] As Reeves explains, the party seeking to export this information will need a license from the DDTC.[90] The licensing process goes

---

[82] *Id.*

[83] *Id.* ¶ 18.

[84] *Id.* ¶ 21.

[85] *Id.* ¶ 19.

[86] Pls.' Opp'n 53; May 2023 Emails Between Jamie Thornback and Captain Marie-Elaine Bernier (attached as Ex. I to Pls.' Opp'n), ECF No. 33-2.

[87] *Id.*

[88] *Id.*

[89] Reeves Decl. ¶ 13 n.14.

[90] *Id.* ¶¶ 14, 17.

through a lengthy and multi-layered process. The application is reviewed and must be approved by various bureaus within the Department of State, Department of Defense or other U.S. agencies having an interest in the documents.[91]

Reeves opines that absent approval, the plaintiffs will be prohibited from sharing export-controlled documents with Canadian legal counsel, experts, and witnesses.[92] She notes that license approvals are not guaranteed and could be denied by the State Department for national security or foreign policy reasons.[93] She explains that export-controlled information already shared between Sikorsky and the Canadian DND would require a new DDTC license to be "retransferred" and used in litigation.[94]

The parties may request an ITAR export license from the DDTC to access and release the military technology information needed to prosecute the case in Canada. The DDTC could deny a license. Even if the parties received a license, the approval process would be lengthy and costly. The ITAR would impede the plaintiffs in getting evidence for use in Canadian litigation. Sikorsky would face that impediment as well.

Sikorsky argues it will have difficulty in getting evidence relevant to its potential defenses if the case remains here.[95] It acknowledges that "all U.S.-based evidence relevant to the Plaintiffs' claims is in [its] possession."[96] But, it argues that evidence in Canada relevant to its defenses is in the possession of non-parties and getting it would

---

[91] *Id.* ¶ 18.

[92] *Id.* ¶ 17.

[93] *Id.* ¶ 19.

[94] *Id.* ¶ 20.

[95] Sikorsky's Br. 21–22.

[96] *Id.* at 21–22.

be significantly costly.

Sikorsky contends that essential evidence relative to a potential defense of contributory negligence is "almost exclusively" in Canada.[97] This includes evidence of the Canadian Air Force training policies instructing pilots on the RTT maneuver, and the maintenance records from 2018 when the fleet was delivered until the incident.[98]

The flight recorder and the wreckage are in Canada. The recorder can easily be duplicated electronically and transmitted anywhere. The wreckage may be used to demonstrate the violence of the crash, but it does not explain why the CH-148 crashed. Photographic evidence will suffice to show the condition of the wreckage.

Damages witnesses are all in Canada. The decedents were in the Canadian military and resided in Canada. Family members, employers and military colleagues, accountants and those with knowledge of the relationships between the decedents and their beneficiaries reside in Canada.[99]

Some potential defense witnesses are or were employed by the Canadian Air Force and government agencies in Canada.[100] They include CH-148 operation supervisors, military pilot trainers and supervisors, eyewitnesses to the crash, civilian and government employees involved in the DTAES certification process, military personnel in charge of maintaining and operating the CH-148, and the accident investigators.[101]

---

[97] *Id.* at 23.

[98] *Id.* at 23. At oral argument, defense counsel conceded that maintenance of the CH-148 did not play a role in the crash.

[99] *Id.* at 26; Defs.' Mem. of L. in Reply to Pls.' Opp'n to Their Mot. to Dismiss Pursuant to *Forum Non Conveniens* 14, ECF No. 36 ["Sikorsky's Reply"].

[100] *Id.* at 26–27.

[101] *Id.*

Given that witnesses relevant to Sikorsky's potential defenses reside in Canada and some are in the Canadian military, the Canada Evidence Act affects its efforts to get this evidence.

Pursuant to Section 38 of the Canada Evidence Act, litigants who possess "sensitive" or potentially injurious" information bearing on Canadian international relations, national defense or national security must obtain permission from the Canadian government before disclosing that information in a legal proceeding. Canada Evidence Act, RSC 1985, c. C-5, s. 38.02(1)–(2). Under Section 38, a litigant must notify the Attorney General of possible disclosure of sensitive information. *Id.* at s. 38.01(1). The Attorney General has ten days to decide whether to allow disclosure. *Id.* at s. 38.03(3). If the Attorney General denies permission or fails to respond within ten days, the litigant may appeal to the Federal Court of Canada. *Id.* at s. 38.04(2).

The Federal Court may prohibit disclosure, authorize partial or full disclosure, impose conditions, or authorize disclosure of a summary of the information. *Id.* at s. 38.06(1)–(3). In reviewing an application for disclosure under Section 38, a judge considers whether the information would be injurious to international relations, national defense or national security and whether the public interest in disclosure outweighs the public interest in nondisclosure. *Id.*

Sikorsky's expert, a former Justice of the Supreme Court of Canada, Honorable William Ian Corneil Binnie, concludes that in either forum, the production of evidence created or possessed by the Royal Canadian Air Force is subject to the discovery

procedure prescribed in Section 38 of the Canadian Evidence Act, RSC, 1985, c. C-5.[102]

He opines that "the DND would be concerned about disclosure of information related to

the design, capabilities and performance of the CH-148 helicopter because it is a military

aircraft, presently in service, as well as issues relating to the training and performance of

air crew."[103] Discovery of this sensitive information would be subject to the Section 38

disclosure process.[104]  He does not offer an opinion whether disclosure would be

permitted.

The Canada Evidence Act restrictions on national security evidence apply

wherever the case is tried. Sikorsky's argument that the Canadian government is less

likely to allow disclosure of sensitive information in a foreign proceeding than in a

domestic proceeding is speculation.[105] No expert has opined how the Canadian

government would likely decide.

Assuming the Canadian government authorizes release of the DND evidence for

use in this case and the litigation proceeds in this forum, the parties can obtain evidence

from Canadian witnesses through letters rogatory.  Sikorsky argues this process is

cumbersome and costly.[106]

A letter rogatory "is the request by a domestic court to a foreign court to take

evidence from a certain witness." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S.

---

[102] Binnie Aff. ¶¶ 83–84.

[103] *Id.* ¶ 85.

[104] *Id.* ¶¶ 96–97.

[105] At oral argument, defense counsel acknowledged that he does not know whether the Canadian government would permit disclosure of information under the Canada Evidence Act.

[106] Sikorsky's Br. 24.

241 n.1 (2004). Federal courts may, upon motion, issue letters rogatory enabling a U.S. litigant to obtain discovery from a non-party in a foreign jurisdiction. Fed. R. Civ. P. 28(b). The court may then send the letters rogatory to the foreign court to request enforcement. 28 U.S.C. § 1781(b)(2) (authorizing "the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal").

In Canada, enforcement of letters rogatory from American courts is governed by the Canada Evidence Act and the law of the province in which discovery is sought. In this case, the relevant provincial law is the Nova Scotia Evidence Act. When a Canadian court receives letters rogatory from a foreign tribunal, it may order the examination under oath or the production of documents from the person or entity named in the request. Canada Evidence Act, R.S.C., 1985, c. C-5, s. 46; Nova Scotia Evidence Act, R.S.N.S., 1989, c. 155, s. 70.

To give effect to letters rogatory, a Canadian court must first determine if the statutory preconditions are met, that is, a foreign court of "competent jurisdiction," in a matter pending before it, authorized discovery from a person within the Canadian court's jurisdiction. *See* Canada Evidence Act, R.S.C., 1985, c. C-5, s. 46; Nova Scotia Evidence Act, R.S.N.S., 1989, c. 155, s. 70; *Zingre v. The Queen et al.*, 2 S.C.R. 392, 405–06 (Can. 1981). If these preconditions are met, the Canadian court may, in its discretion, grant or deny the discovery request. In exercising its discretion, the Canadian court may consider whether: (1) the evidence is relevant; (2) the evidence is necessary for trial and will be adduced at trial, if admissible; (3) the evidence is not otherwise obtainable; (4) the order is not contrary to public policy; (5) the documents are identified with reasonable specificity; and (6) the order will not be unduly burdensome on the person or entity

providing discovery. *Cytozyme Laboratories Inc. v. Acadian Seaplants Limited*, 2018 N.S.S.C. 137, ¶ 23 (Can. N.S. Sup. Ct. 2018); *Lantheus Medical Imaging Inc. v. Atomic Energy of Canada Ltd.*, 115 O.R. 3d 161, ¶ 60 (Can. Ont. C.A. 2013).

Canadian courts adopt a "liberal approach" to enforcing letters rogatory from U.S. courts. *District Court of United States, Middle District of Florida v. Royal American Shows Inc.*, 1 S.C.R. 414, 421 (Can. 1982); *Sunline USA LLC v. Ezzi Grp., Inc.*, No. CV 22-1650, 2023 WL 9004919, at *5–6 (E.D. Pa. Dec. 28, 2023) (finding that the need for significant Canadian discovery did not warrant dismissal on *forum non conveniens* grounds, given Canada's "accommodating posture" toward enforcing letters rogatory from the United States).

Plaintiffs challenge Sikorsky's contention that it would be more convenient to litigate its potential defense of contributory negligence against the DND in Canada. Plaintiffs rely on the expert affidavit of former Canadian judge, Honorable Michael L. Phelan.[107] He explains that the DND, as an entity of the Crown, cannot be a party in either the United States or Canada.[108] Phelan explains that the Crown Liability and Proceedings Act ("CLPA"), provides tort immunity to the DND where the cause of action arises out of an incident for which it has already paid pension benefits or compensation.[109]   He explains:

> The *CLPA* in s. 9 provides that no proceedings lie against the Crown if a pension or compensation has been paid or is payable by the federal government in respect of the death, injury or loss in respect of which the claim is made. . . . The bar of the claim arises so long as the pension or

---

[107] Aff. of Hon. Michael L. Phelan (attached as Ex. B to Pls.' Opp'n), ECF No. 33-2 ["Phelan Aff."].

[108] *Id.* ¶ 10.

[109] *Id.* ¶ 19.

> payment is on the specific basis of the occurrence giving rise to the claim; all damages arising out of the incident which entitles the person to a pension will be subsumed under the bar in s.9."[110]

Phelan concludes that because the Canadian government paid compensation to the decedents' families, they cannot bring a claim for damages against it.[111]  Phelan also concludes that Sikorsky "could neither seek contribution from DND nor seek to reduce the extent of their own responsibility to pay damages to the plaintiff by seeking a finding as to the degree of fault, if any, of DND."[112]

Phelan opines that the DND's immunity under the CLPA also insulates it from discovery in proceedings in which it is not a party.[113]  He opines that because the Crown is not a party, DND officials, as representatives of the Crown, cannot be compelled to appear for depositions.[114] He references the Canadian Supreme Court decision in *Canada (Attorney General) v. Thouin*, 2 S.C.R. 184 (Can. 2017).[115] He concludes that if the case were to proceed in Nova Scotia, the DND would be immune from documentary and oral discovery.[116]

Sikorsky's expert Binnie disagrees. He opines that, under *Thouin,* the Crown "may still be subject to disclosure of relevant documents."[117] He also concludes that although

---

[110] *Id.* ¶¶ 11–12 (internal quotations omitted).

[111] *Id.* ¶ 19.

[112] *Id.* ¶ 26.

[113] *Id.* ¶ 32.

[114] Pls.' Opp'n 47 (citing Phelan Aff. ¶¶ 27-34).

[115] Phelan Aff. ¶ 31.

[116] *Id.*  Phelan acknowledges that at least one Canadian court has suggested that the Crown, as a nonparty, may still be compelled to produce documents within its possession. *Id.* ¶ 33. Phelan considers this position to be wrong as a matter of law. *Id.*

[117] Suppl. Aff. of the Hon. Ian Binnie ¶ 6 (attached as Ex. A to Sikorsky's Reply), ECF No. 37

DND representatives may not be deposed, they can be subpoenaed to testify at trial if the case proceeds in Canada.[118]

Discovery depositions of DND employees would be unavailable in Canada. The process Sikorsky argues would make getting evidence in Canada relevant to its defense is no less costly whether the case is litigated in the United States or Canada. The evidence is with the DND, a non-party. The DND cannot be added as a defendant in the United States or Canada. The Canadian government cannot be sued pursuant to Section 9 of Canada's CLPA.

Canada and its representatives may be immune from tort liability and its representatives may not be compelled to submit to pretrial discovery. That does not mean Sikorsky cannot blame them, in full or in part, for causing the crash. Sikorsky cannot join them as defendants and recover any damages from them.

The experts disagree whether DND persons can be compelled to produce documents and submit to depositions before trial. They agree they can be compelled to testify at trial if the case proceeds in Canada.

The parties disagree whether DND officials can be compelled to provide trial testimony if the case proceeds in the United States. Sikorsky argues Canadian witnesses cannot be compelled to attend trial in Pennsylvania because it is beyond the 100-mile limit of this court's subpoena power.[119] Plaintiffs argue that the parties can use the letters rogatory process to compel "videotaped or live video feed trial testimony" from DND

---

["Suppl. Binnie Aff."].

[118] *Id.* ¶ 6.

[119] Sikorsky's Br. 22.

witnesses located in Canada.[120] They cite *Lantheus Medical Imaging Inc. v. Atomic Energy of Canada Ltd.,* 115 O.R. 3d 161, paras. 5, 71, 77–79, in which the Ontario Court of Appeal enforced the Southern District of New York's letters rogatory requesting document production and oral testimony of Crown agents for use at trial.[121] Neither party produced expert opinion regarding whether a Nova Scotia court would enforce letters rogatory seeking DND testimony for use at trial in the United States.

Even if Sikorsky is able to obtain deposition or trial testimony from the DND, it will be subject to restrictions under Section 38 of the Canada Evidence Act. Limitations on obtaining evidence from the DND exist in either forum. So, Sikorsky cannot complain that the difficulty in getting evidence is unique to litigating the case here.

The cost for willing witnesses to attend trial and the methods available for compelling the attendance of unwilling witnesses cuts both ways. One party will be more burdened than the other depending on whether the case is litigated here or in Nova Scotia.

Liability witnesses are in the United States. If the case is tried in Canada, plaintiffs will have to obtain their testimony through letters rogatory. ITAR regulations may delay or restrict the production of protected evidence in a Canadian proceeding.

On the other hand, some of the witnesses regarding DND's collaboration in the manufacturing process and its use of the CH-148 are in Canada and will not be readily available. Damages evidence and witnesses are located in Canada. If the case proceeds

---

[120] Pls.' Opp'n 47.

[121] *Id.*

here, Sikorsky will have to obtain defense-related evidence from Canada through letters rogatory. The DND's immunity from liability and nonparty discovery and restrictions under the Canada Evidence Act will apply with equal force in either forum.

The first and second private interest factors—access to sources of proof and availability of witnesses—weigh in favor of the plaintiffs. There are conveniences and inconveniences in both fora for both sides. The most critical evidence is in the United States where Sikorsky is located and where it is accessible to plaintiffs.

With respect to the third factor, there is no suggestion that the environment or conditions were unique to the crash site. There was nothing peculiar to the crash site that would require a view of the crash scene. Neither party suggests otherwise.

Evidence of the crew's final moments is not found in the CH-148 wreckage. It is in the flight data recorder and the cockpit voice recorder, which are in possession of the Canadian DND. The data recovered from the helicopter's flight data recorder is in the United States and Canada. Sikorsky relied on it to reconstruct the accident and uncover the Command Model Attitude Bias phenomenon. The Canadian government has the cockpit voice recorder,[122] which can be electronically transferred to the United States.

The fourth private interest factor weighs practical considerations that would make trying the case easy, inexpensive, and expeditious. Sikorsky argues that because there is pending litigation in Nova Scotia by an air force member who witnessed the accident, which also alleges faulty design, testing and incomplete inspection of the helicopter, it would be oppressive and vexatious for Sikorsky to litigate the two cases in different

---

[122] Sikorsky's Br. 30 n.34; Pls.' Opp'n 53.

fora.[123]

Although the lawsuit pending in Nova Scotia involves the same crash, it is different. The parties to the lawsuit in Canada are not the same as the parties in this action. The cases will not be litigated together. Sikorsky will have to try two cases no matter where they are tried. There is no discernable inconvenience in trying the two cases in different fora.

The plaintiffs argue that if the case is tried in Canada, they would be precluded from introducing the FSIR, which examined and opined on the cause of the accident. They point to the Canadian Aeronautics Act, R.S.C., 1985, c. A-2, which makes Airworthiness Investigative Authority opinion evidence inadmissible in legal proceedings.[124]

Plaintiffs' expert Barry Mason, a Canadian civil litigator who is a former member of the Discovery Rules Committee and current member of the Bench and Bar Rules Committee, explains that the Canadian rules of evidence require experts to certify their opinions to a degree of certainty. Mason opines that "it would be exceedingly difficult, if not impossible, to persuade a government official to sign the necessary certification and . . . . [m]ost often, experts of this nature, refuse or are not permitted to engage in a private civil matter."[125]  Plaintiffs argue that because the parties cannot depose members of the Canadian Armed Forces whether the case is litigated here or in Canada, the FSIR "takes

---

[123] Sikorsky's Br. 30–31.

[124] Pls.' Opp'n 49.

[125] Aff. of Barry Mason ¶ 127 (attached as Ex. O to Pls.' Opp'n), ECF No. 33-5 ["Mason Aff."].

on added importance".[126]

Sikorsky disagrees. It argues that the use of the FSIR "would not vary significantly" if the case is tried in Canada or the United States.[127] Responding to Mason's affidavit, Sikorsky's expert Binnie opines that the facts in the FSIR report would be admissible at trial in Nova Scotia and they could be relied on by experts for the purposes of expert testimony.[128] He also stated that under Canadian law, the FSIR investigator could be compelled to testify about his observations and results of the investigation.[129]

Differences in rules allowing or disallowing certain evidence are not considered in the analysis of private interests. They may be relevant in determining the adequacy of the alternative forum. They are not a convenience factor. Hence, we do not consider them in our analysis.

*Public Interest Factors*

We turn to the public interest factors. They include court congestion, the forum's interest in having local disputes decided "at home," the interest in having the case decided in the forum whose law will govern the case, the avoidance of unnecessary conflict of laws problems, and the unfairness of burdening citizens with jury duty in a forum having no relationship to the dispute. *Windt*, 529 F.3d at 189 (citing *Gilbert*, 330 U.S. at 508-09).

The first public interest factor is the "administrative difficulties flowing from court congestion." *Windt*, 529 F.3d at 189 (citing *Gilbert*, 330 U.S. at 508). We look at the

---

[126] Pls.' Opp'n 50.

[127] Sikorsky's Reply 9.

[128] Suppl. Binnie Aff. ¶¶ 18-19.

[129] *Id.* ¶¶ 20–25.

relative congestion of the dockets in Nova Scotia and the Eastern District of Pennsylvania.

As of June 30, 2024, the Eastern District of Pennsylvania had an average of 382 pending cases per judgeship.[130] The median time from filing to trial of a civil case in the Eastern District of Pennsylvania is 27.1 months.[131] This judge has 112 pending civil cases and the median time from filing to trial is 13 months.[132]

According to Sikorsky's expert, Adam L. Harris, the "typical length of a trial from start to finish" in Nova Scotia is one and a half to two years.[133] The plaintiff's expert, Barry Mason, disagrees. Mason, a personal injury litigator practicing in Nova Scotia,[134] estimates that given the need for substantial discovery, compelling the attendance of witnesses outside Canada, and the potential for evidentiary disputes in a complex wrongful death action, the case would take five to eight years to resolve in Nova Scotia.[135] Neither side has presented any published caseload and time-to-trial information of the Nova Scotia courts.

Litigating the case in the Eastern District of Pennsylvania would expedite the resolution of the case and would not burden the docket. The congestion factor favors this forum.

---

[130] U.S. District Courts, Combined Civil and Criminal Federal Court Management Statistics, National Judicial Caseload Profile (June 30, 2024), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0630.2024.pdf.

[131] *Id.*

[132] Judge Timothy J. Savage, Lexis Nexis Litigation Analytics, https://plus.lexis.com/litigationanalytics/judge/68815 (last visited Sept. 27, 2024).

[133] Sikorsky's Br. (citing Aff. of Adam L. Harris ¶ 27 (attached as Ex. K to Sikorsky's Br.), ECF No. 16-4.)

[134] Mason Aff. ¶¶ 23-24, 128–29.

[135] *Id.* ¶¶ 23–25, 128–30.

Regarding the local interest in the controversy factor, Sikorsky argues that Canada has a greater interest in this litigation because its military solicited and exclusively owned and operated the CH-148, it certified the CH-148 for military use, the accident killed Canadian military members, and the Canadian authorities investigated the accident.[136] The plaintiffs counter that the Eastern District of Pennsylvania and the United States have an interest in promoting safe products and in deterring tortious conduct of its residents.[137]

Sikorsky contends that even if there is a legitimate local interest in deterring the corporation's conduct, its Coatesville facility "played no role in the design, manufacturing, testing or selling" of the EFCS technology in the CH-148.[138] Sikorsky ignores that it heralded its Coatesville facility as "Home of the CH-148."

The plaintiffs' theory is that Sikorsky's CH-148 helicopter fleet contained a design defect. Because the CH-148 was manufactured in the United States and the Block 2 upgrades portion of the manufacturing process that made the fleet operational were installed in the Coatesville facility, Sikorsky's tortious conduct occurred in the United States, including in the Eastern District of Pennsylvania.

Pennsylvania has an interest in regulating the behavior of corporations operating in the Commonwealth. *See Behrens v. Arconic*, Inc., 487 F. Supp. 3d 283, 333 (E.D. Pa. 2020) (rev'd in part on other grounds) ("Many courts have recognized a state's legitimate interest in policing the conduct of corporations that operate within its borders, especially in the context of an international accident."); *Incubadora Mexicana, SA de CV v. Zoetis,*

---

[136] Sikorsky's Br. 34–38.

[137] Pls.' Opp'n 57–59.

[138] Sikorsky's Reply 18, 21.

*Inc.*, 116 F. Supp. 3d 519, 525 (E.D. Pa. 2015) ("Pennsylvania has an interest in ensuring that its corporations do not engage in tortious conduct which causes injury to anyone, regardless of where those individuals reside."); *Harrison v. Wyeth Lab'ys Div. of Am. Home Prods. Corp.*, 510 F. Supp. 1, 4 (E.D. Pa. 1980) (recognizing "Pennsylvania's interest in the regulation of the conduct of drug manufacturers and the safety of drugs produced and distributed within its borders"). This interest is not limited to a single helicopter and a single incident. Sikorsky markets, designs, and manufactures and sells helicopters to users throughout the United States. Pennsylvania has an interest in the safety of products introduced into the stream of commerce from here. The United States has an interest in "redressing wrongful conduct" of U.S. corporations. *See Windt,* 529 F.3d at 193–94 ("[T]he United States has an interest in redressing wrongful conduct engaged in by a U.S. corporation and American executives.").

Pennsylvania also has a reputational interest. It benefits from a reputation for its manufacturers producing safe and reliable products. That reputation is harmed when someone is killed using the product. Conversely, it is enhanced when it is determined that it designed a safe product. Thus, on one hand, Pennsylvania has an interest in ensuring that corporations manufacture and sell safe products, and on the other, that they are not unfairly treated when their product is safe.

Canada's interest in this dispute is significant. The decedents were all Canadian Air Force members who died while conducting a Canadian military training exercise. The plaintiffs are all Canadian citizens—five of the plaintiffs reside in Nova Scotia, and one in

British Columbia.[139] The helicopter was produced exclusively for the Canadian military. Canada certainly has an interest in protecting its citizens, particularly members of its military, from faulty and unsafe products.

Pennsylvania and Nova Scotia each have local interest in the controversy. Nova Scotia has the greater interest even though its citizens involved stand to receive a greater recovery in this forum. Canada has a greater interest in resolving claims arising out of a fatal accident that occurred when its Air Force members were engaged in military exercises. The local interest factor weighs in favor of litigating the case in Nova Scotia.

The next relevant factor is the public interest "in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Gilbert*, 330 U.S. at 509. The need to apply foreign law generally favors dismissal. *Piper*, 454 U.S. at 260. However, other factors may outweigh that factor.

The plaintiffs bring this action under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301, *et seq.* DOHSA allows the personal representative of any person who dies due to "a wrongful act, neglect, or default occurring on the high seas," to "bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302. Although it is the exclusive remedy for wrongful death on the high seas and supersedes any state wrongful death statute, DOHSA does not preclude recovery under Pennsylvania's survival statute. *Dugas v. Nat'l Aircraft Corp.*, 438 F.2d 1386, 1388–89, 1391 (3d Cir. 1971).

---

[139] Compl. ¶¶ 33–38.

DOHSA actions give rise to maritime jurisdiction. *See* 46 U.S.C. § 30302 (providing a claim to relief "in admiralty" under DOHSA); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 217 (1986).  Because we exercise maritime jurisdiction over this case, we apply federal maritime choice of law rules to determine whether the laws of the United States or Canada apply. *See Blue Whale Corp. v. Grand China Shipping Development Co., Ltd.*, 722 F.3d 488, 495 (2d Cir. 2013). The conflict of laws analysis in maritime actions involves a two-step test.  *See Neely v. Club Med Management Services, Inc.*, 63 F.3d 166, 182–83 (3d Cir. 1995). First, do we have prescriptive jurisdiction? *Id.* Second, if so, is it reasonable to apply American law?  *Id.* If the answer to both questions is yes, American law applies. *Id.* at 184.

To establish prescriptive jurisdiction, plaintiffs must demonstrate one of the following: injury to an American seaman or a seaman with American dependents; injury in American territory; American defendants; an American flagged ship; or a contractual choice of law provision selecting American law. *Id.* at 182, 186. Sikorsky is an American defendant. Therefore, we have prescriptive jurisdiction over this action.

We now assess the reasonableness of applying American law. In doing so, we look to the factors enumerated in *Lauritzen v. Larsen* 345 U.S. 571, 590–92 (1953), *Romero v. International Terminal Operating Co.*, 358 U.S. 354 (1959), and *Hellenic Lines v. Rhoditis*, 398 U.S. 306 (1970).[140] The factors are: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured party; (4) the allegiance or domicile of the defendant; (5) the place where the contract was made; (6) the

---

[140] Together these cases are known as the "*Lauritzen* triad." *Neely*, 63 F.3d at 170.

inaccessibility of the foreign forum; (7) the law of the forum; and (8) the defendant's base of operations. We consider only those factors relevant to the case.  *See Neely*, 63 F.3d at 174.

The *Lauritzen* factors are a guide to determining whether applying the law of the forum would be reasonable in light of the facts. They are not controlling or dispositive. They are meant to inform the reasonableness determination. They are not mechanically applied. The significance of a factor varies depending on the facts. *Id.* at 182.

The benchmark of the analysis is reasonableness. The *Lauritzen* analysis aims to assure that American law is not applied to cases lacking a significant American connection and to resolve conflicts with the maritime laws of other nations.

The first *Lauritzen* factor considers the place of the wrongful act. The alleged defective design, manufacture, marketing and upgrades to the CH-148 occurred in the United States in Sikorsky's facilities in Connecticut, Florida, and Pennsylvania. The helicopter was tested and certified in Canada. It was also tested in the United States. In this case, the first factor is bolstered by the fourth (defendant's allegiance and domicile) and the eighth (defendant's base of operations). Together they favor applying American law.

Sikorsky is an American citizen. It is incorporated in Delaware and has its principal place of business in Connecticut. It has a production facility located in Florida. It is an American citizen.

The defendant's base of operations is in the United States. Sikorsky operates in the United States. Although it has since closed its Coatesville facility, it operated that facility at the time of the wrongful conduct. Sikorsky still operates its headquarters in

Connecticut and a production facility in Florida.

The remaining factors are not as significant as the first, fourth, and eighth factors. The helicopter flew under the Canadian flag and the plaintiffs are domiciled in Canada.

The place of contracting is "of little import" in the maritime tort setting, because the location of the vessel at the time of injury is generally fortuitous. *Neely*, 63 F.3d at 192; *Lauritzen*, 345 U.S. at 588–89. Moreover, there is no direct contractual relationship between plaintiffs and Sikorsky. *Melgares v. Sikorsky Aircraft Corp.*, 613 F. Supp. 2d 231, 251 (D. Conn. 2009). Therefore, the fifth factor is not relevant here.

The law of the forum is a "very weak consideration" in the conflict of laws analysis. *Neely*, 63 F.3d at 190 (citing *Lauritzen*, 345 U.S. at 591 ("Jurisdiction of maritime cases in all countries is so wide and the nature of its subject matter so far-flung that there would be no justification for altering the law of a controversy just because local jurisdiction of the parties is available.")). Nonetheless, the forum is in the United States. The law of the forum supports application of United Sates law.

Neither forum in the United States or Canada is inaccessible to the parties. The law of either forum is adequate.

The place of the wrongful act, the allegiance and domicile of the defendant, the law of the forum, and the defendant's base of operations weigh in favor of applying United States law. Because we have prescriptive jurisdiction and it is reasonable to apply American law, there is no conflict of laws issue.

In analyzing the final public interest factor, we consider the unfairness of burdening citizens with jury duty in a forum having no relationship to the litigation. See *Gilbert*, 330 U.S. at 508–09. This case involves complex technical and military issues. However, as

we have already concluded, Pennsylvania has a significant relationship to this litigation. The alleged defective helicopter was upgraded and tested in Coatesville, Pennsylvania for two years before being deemed operational by the Canadian military. Therefore, it would not be unfair or a burden for the citizens of Pennsylvania to determine whether a corporation that placed the helicopter into the stream of commerce from here is liable.

## Conclusion

The difficulties Sikorsky raises do not override the plaintiffs' choice of forum that is based on access to evidence critical to the claims. The difficulties will not result in oppression and vexation to Sikorsky out of all proportion to the plaintiffs' convenience. Therefore, we shall deny the motion to dismiss this action on *forum non conveniens* grounds.